1   Warren M. Chadwick Jr.
2   11308 Blue Sage Drive
    Sylmar, CA 91342
3   (818) 414-6853

FILED
CLERK, U.S. DISTRICT COURT

DEC 2 8 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Fee Paid

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARREN M. CHADWICK JR., | ) Case No. |
| Plaintiff, | ) **CV12-11034-PSG(JCGx)** |
| vs. | ) **COMPLAINT FOR:** |
| BANK OF AMERICA N.A.; BAC HOME LOANS SERVICING, LP; THE BANK OF NEW YORK MELLON f/k/a THE BANK OF NEW YORK, as Trustee for the Certificate Holders of CWABS, Inc., Asset-Backed Certificates, Series 2007-13; RECONTRUST COMPANY N.A. and DOES 1 THROUGH 10 INCLUSIVE, | ) 1. **BREACH OF CONTRACT**<br>) 2. **DECLARATORY RELIEF [28 U.S.C.§2201,2202]**<br>) 3. **NEGLIGENCE**<br>) 4. **QUASI CONTRACT**<br>) 5. **VIOLATION OF [15 U.S.C. §§ 1692 et seq.]**<br>) 6. **Violation of CALIFORNIA BUSINESS AND PROFESSIONS** |
| Defendants, | ) |
| | ) **Jury Trial Demanded** |



PAID

DEC 2 8 2012

Clerk, US District Court
COURT 4612

## TABLE OF CONTENTS

COMPLAINT ............................................................................... 3

I.  STATEMENT OF FACT........................................................... 3

II. JURISDICTION AND VENUE ................................................ 4

III. THE PARTIES...................................................................... 5

IV. GENERAL FACTUAL ALLEGATIONS.............................. 6

V. INTRODUCTION.................................................................. 7

VI. MERS ROLE AND WHY MERS DID NOT CAUSE THE ASSIGNMENT.........15

VII: PLAINTIFF HAS SUFFERED............................................ 17

VIII: FIRST CAUSE OF ACTION- BREACH OF CONTRACT...................... 19

IX: SECOND CAUSE OF ACTION-DECLARATORY RELIEF................................ 22

X: THIRD CAUSE OF ACTION-NEGLIGENCE........................................ 23

XI: FOURTH CAUSE OF ACTION-QUASI CONTRACT........................................ 25

XII: FIFTH CAUSE OF ACTION.................................................. 25

XIII: SIXTH CAUSE OF ACTION.............................................. 27

XIV: PRAYS FOR RELIEF......................................................... 30

DEMAND FOR A JURY TRIAL................................................. 31

EXHIBITS PAGE....................................................................... 32

VERIFICATION AND ACKNOWLEDGEMENT............................................ 33 & 34

## COMPLAINT

COMES NOW Plaintiff Warren M. Chadwick Jr. ("Plaintiff or collectively Mr. Chadwick") for his Complaint against Defendants, Bank of America N.A. (In its capacity as the purported Servicer and Collector of the purported debt), (hereafter; BofA); BAC Home Loans Servicing, LP (In its capacity as the purported original Servicer and Collector of the purported debt), (hereafter; BAC); The Bank of New York Mellon f/k/a The Bank of New York, as Trustee for the Certificateholders of CWABS, Inc., Asset-Backed Certificates, Series 2007-13 (In its capacity as purported Beneficiary of the Debt of the Plaintiffs' Note and Deed of Trust), (hereafter; BONYM); and Recontrust Company N.A. (In its capacity as the purported substituted Trustee of the Deed of Trust), collectively "Defendants" as follows:

### I. STATEMENT OF FACT

1. The Plaintiff alleges that Defendants are not true parties to his mortgage loan and have no ownership interest entitling them to collect payments or to declare a default. By hiding behind the complexities of the Mortgage Lending System, Defendants brazenly attempt to dupe the Plaintiff into believing that they are in the right to collect on debt in which BONYM and/or BofA has no ownership interest. In an attempt to further their fraudulent scheme and create the air of propriety surrounding their debt collection efforts, Defendants have resorted to "papering the file" by fabricating an "Assignment of Deed of Trust" to the alleged Beneficiary The Bank of New York Mellon f/k/a The Bank of New York, as Trustee for the Certificateholders of CWABS, Inc., Asset-Backed Certificates, Series 2007-13 (hereafter, BONYM) and fabricating and recording of a "Substitution of Trustee" to Recontrust Company N.A. and falsely representing to Plaintiff and *to the court* that they have the right to take Plaintiffs' property away. In addition; the Defendants have misrepresented themselves in the capacity of multiple parties with the legal right to collect and demand payments from the Plaintiff; the Defendants have entered into and have breached multiple contracts with the Plaintiff by representing themselves to the Plaintiff as the (Servicer, Assignee, Creditor, Owner and the purported Collector of the alleged debt) in order to deceive the Plaintiff into making payments that were never properly allocated and accounted for.

Further; the Defendants have refused to properly respond, communicate and to provide documentations that were requested by the Plaintiff as afforded by law.

Lastly; the Defendant BONYM as the purported beneficiary of the alleged debt and mortgage "the Loan" has violated the proper Assignment of the original Note and Deed of Trust; in fact BONYM as the alleged beneficiary has no ownership interest in purported debt and mortgage "the Loan" and was merely hired to oversee the function of collection. The alleged "debt" is no longer in existence and has been dissolved as part of the ***Economic Stabilization Act of 2008*** as initiated and approved by Congress. The Plaintiff who has been left with no other option to cure his damages now files his complaint in Federal Court. Through this action, the Plaintiff seeks compensation and restitution for his damages and intends to STOP Defendants' fraudulent practices; discover the true Holder in Due Course of his Promissory Note ("Note"), and determine the status of Defendants' claims.

## II. JURISDICTION AND VENUE

2. The court has jurisdiction over the action pursuant to Title [28 U.S.C. § 1332] which confers original jurisdiction on federal district courts in suits between diverse citizens that involve an amount in controversy in excess of $75,000.00.

3. The Court also has original jurisdiction over the action pursuant to Title [28 U.S.C §1331, 2201, 2202], [Title 12 U.S.C § 2605; 42 U.S.C. § 1983], Fair Debt Collection Practices Act [15 U.S.C. § 1692-1692p & Title 8 U.S.C. § 802 et seq.] which confer original jurisdiction on federal district courts in suits to address the deprivation of rights secured by federal law[1]. The Defendants and each of them have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, in connection with the transactions, acts,

---

[1] The Ninth Circuit instructs that in actions brought under 28 U.S.C. 2201, district courts must first determine whether this is actual controversy within its jurisdiction by analyzing the factors enumerated in ***Brillhart v. Excess Ins. Co.*** , 316 U.S. 491(1942). The ***Brillhart*** factors require the Court to (1) avoid needless determination of state law issues; (2) discourage litigants from filing declaratory actions as means of forum shopping; and (3) avoid duplicative litigation. ***Brillhart***, 316 U.S. at 495; see also ***Schafer V. Citimortgage*** No.CV 11-03919, WL 2437267   (C. D .Cal. June 15,2011); As held by the court in ***Schafer***, the action does not involve a needless determination of state law issues, does not involve forum shopping, and is not duplicative litigation.

practices and courses of business alleged in the complaint and as such plaintiffs have been aggrieved, or legally harmed by the Defendant's actions.

4. The Court also has supplemental jurisdiction over the pendant law claims because they form a part of the same case or controversy under Article III of the United States Constitution, pursuant to [ 28 U.S.C. § 1367].

5. The unlawful conduct, illegal practices, and acts complained of and alleged in the complaint were all committed in the Central District of California and involved real property located in the Central District of California. Therefore, venue properly lies in the District, pursuant to 28 U.S.C. § 1391(b).

6. Plaintiff is now and at all times mentioned herein, individual residing in Los Angeles County. At all times relevant to the action, Plaintiff has owned real property commonly known as 11308 Blue Sage Drive, Sylmar, CA 91342 ("Property").

### III. THE PARTIES

7. PLAINTIFF, WARREN M. CHADWICK JR., at all times herein relevant to the complaint is the owner of real property commonly known as 11308 Blue Sage Drive, Sylmar, CA 91342 ("Plaintiff").

8. DEFENDANT, BANK OF AMERICA N.A. (BofA), a Delaware Corporation as the purported servicer of the alleged debt ("Debt Collector & alleged creditor of the alleged debt").

9. DEFENDANT, BAC HOME LOANS SERVICING LP, (BAC), a subsidiary of (Bank of America N.A.), as the initial alleged servicer of the alleged debt and the alleged creditor. ("Debt Collector & alleged creditor of the alleged debt").

10. DEFENDANT, BANK OF NEW YORK MELLON f/k/a THE BANK OF NEW YORK, as Trustee for the Certificate Holders of CWABS, Inc., Asset-Backed Certificates, Series 2007-13, a New York Corporation as the purported Assignee and Beneficiary of the purported debt servicer of the alleged debt ("Debt Collector and alleged creditor of the alleged debt").

11. DEFENDANT, RECONTRUST COMPANY N.A., as the purported Trustee of the Deed of Trust. ("Debt Collector and alleged Trustee of the Deed of Trust").

12. DOES 1 THROUGH 10 INCLUSIVE, The Plaintiff does not know the true names and nature of Defendants DOES 1 THROUGH 10 INCLUSIVE, and will amend the complaint when their true identities have been ascertained according to proof at trial.

13. Whenever reference is made in the Complaint to any act of any Defendant(s), that allegation shall mean that such Defendant acted individually and jointly with the other Defendants.

14. Any allegation about acts of any corporate or other business means that the corporation or other business did the acts alleged through officers, directors, employees, agents and /or representatives while they were acting within the actual or ostensible scope of his authority.

15. At all relevant times, each Defendant committed the acts, caused or directed others to commit the acts, or commit the acts alleged in the Complaint. Additionally, some or all of the defendants acted as the agent of the other Defendants, and all of the Defendants acted within the scope of their agency if acting as an agent of the others.

16. At all relevant times, each Defendant knew or realized that the other Defendants were engaging in or planned to engage in the violations of law alleged in the complaint. Knowing or realizing that the other defendants were engaging in or planning to engage in unlawful conduct, each defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other defendants in the unlawful conduct.

## IV: GENERAL FACTUAL ALLEGATIONS

17. The Plaintiff is informed and believes and re-alleges thereon that Defendants are not true parties to his alleged debt and mortgage and have no ownership interest entitling them to collect payment or declare a default. The Defendant BofA entered into a contract with the Plaintiff for a loan modification without proper disclosures as to their true role in the purported debt and later by collecting and misallocation of those funds from the Plaintiff proceeded to breach the newly formed contract; the Defendant has collected from the Plaintiff and show the funds to be allocated to accounts that are not related to the purported loan under (***Misc. Posting***

*etc..)* and as such has acted as a debt collector and not a servicer as purported to the Plaintiff. The Defendants have been engaged in an elaborate business practice to deceive, misrepresent and have schemed to commit fraud and other acts of fraud against the Plaintiff in order to collect on purported debt, Defendants have resorted to "papering the file" by fabricating and falsely representing to the Plaintiff and the court that they have the right to take the Plaintiffs' real property away. Not only is Defendants' conduct a ***criminal violation*** and an affront to long-standing property laws, but their reliance on fabricated and forged documents undermines the integrity of the judicial system. Through this action, Plaintiff seeks to stop Defendants fraudulent practices, discover the true holder in due course of the alleged debt evidenced by the Promissory "Note", and determine the status of Defendants' claims.

## V. INTRODUCTION

18. During the high times of the mortgage refinancing and mortgage origination era 2002-2007 Wall Street investors looked to feed their insatiable and reckless greed for profit by tapping directly into the American Dream-home ownership. Mortgage lenders and investment banks aggressively lured the American people into the predatory loans with teaser interest rates and into purchasing homes with inflated appraisals[2] and under the promise that the booming real estate market would continue to boom. Wall Street took the soon to be toxic loans and bundled them into "*Mortgage Backed Securities*" through a process known as "*Securitization*". These "*Securities*" were then sold to investors in the form of certificates, whereby the investors became the "*Certificateholders*" of the securities that were to be fed by the toxic loans.

---

[2]   (Reuters) - A former home appraiser will receive $14.5 million as part of a whistleblower lawsuit that accused subprime lender Countrywide Financial of inflating appraisals on government-insured loans, his attorneys said Tuesday. Kyle Lagow's lawsuit sparked an investigation that culminated in a $1 billion settlement announced in February between Bank of America Corp (NYS:BAC - News) and the U.S. Justice Department over allegations of mortgage fraud at Countrywide, his attorneys said in a news release. Bank of America bought Countrywide in 2008.Lagow's suit was one of five whistleblower complaints that were folded into the $25 billion national mortgage settlement that state and federal officials reached with Bank of America and four other lenders the year. His suit was unsealed in February, but the amount of his settlement had not been disclosed. http://finance.yahoo.com/news/bank-america-whistleblower-receives-14-232819912

19. The Defendant BofA and others became facilitators of this process by gathering large numbers of loans originated through other entities; the process is referred to as "*Pooling of Loans for Securitization*", the Defendant pooled and placed these loans into "*Common Law Trusts*" and issued certificates in exchange of notes that were transferred into the *"Securitized Trust"*. As the certificates were traded into the marketplace the Wall Street players placed their bets and purchased contracts that would pay them in the case of default; they *shorted* the same market they were feeding.

20. Knowing that the predatory loans would soon default and turn into toxic assets Wall Street placed his bets accordingly and bought exotic insurance products in the form of Credit Default Swaps[3]. The eventual meltdown of the market provided Wall Street with even more ridiculous profits.

21. However, as Wall Street which includes our Defendant BofA, rushed to "*Securitize*" these loans they forgot their own rules and written compliance documents that are required to be followed by the letter of the law. Wall Street created a situation by which the "*Mortgage Backed Securities*" that were supposed to be backed by mortgages were actually not secured by anything except the number of dollars associated with the alleged transactions and not by any actual mortgages to back the securities[4]. Under the standard model for securitization the "Notes" were **supposed** to be sold and transferred into a trust pool "*Securitized Trust*" that holds the promissory notes as collateral on the securities bought by investors ("Certificateholders"). These "*true sales*" allow the original lenders to move the notes of their books, eliminating the need to maintain capital-adequacy reserves against defaults. The purpose of securitizing

---

[3] In 1995, JPMorgan credit the Credit Debt Swap (CDS), essentially, a CDS is a form of insurance intended to protect the buyer of the policy in the case the borrower defaults on the loan. If the borrower defaults, the buyer of the CDS receives a large payout for the cash value of the defaulted loan. The main difference between traditional insurance policy and a CDS is that anyone can purchase a CDS; even those who have no direct "insurable interest" in the lender. CDSs' were instrumental during the housing bubble because once the banks ran out of creditworthy borrowers; they had to run to un-creditworthy subprime borrowers. To avoid losses from defaults, the banks moved these risky mortgages off his books by bundling them into "securities" and selling them to investors. The CDS market is the only major financial sector of the market that is not  governed by any rules, Due to the sector the estimated exposure to losses is in the Trillions for the taxpayers.

[4] The transfer of Assets were only reflected on the Books (Ledgers) and no actual documents were properly endorsed or Assigned over to the Trustee of the Securitized Trust.

collateral debt obligations was to provide a large supply of money for the lenders for originating loans, and to provide investments to bond holders - which were expected to be relatively safe.

22. The formation of a proper and compliant Securitized Trust requires that the Trust to be Governed by (1) the Pooling and Servicing Agreement; (2) the Mortgage and Loan Agreement;(3) the 424(b) (5) Prospectus; (4) the common law trust rules of Delaware or New York, depending on its origin, and (5) Internal Revenue Code section 860A through 860G better known as the real Estate Mortgage Investment Conduit ("REMIC") rules.

23. An essential aspects of the mortgage securitization process is that the Trust must obtain and maintain good title to the mortgage loans comprising the pool for that certificate offering. This is necessary in order for the Trustee of the purportedly Securitized Trust to be legally entitled to enforce the mortgage loans in the case of default. In addition to other required documentation to complete the Collateral File of any given loan, two documents relating to each mortgage loan must be validly transferred to the Trust as part of the securitization process - the (Promissory Note) and the security instrument (Deed of Trust or Mortgage Note). In this case, on information and belief, neither document was validly transferred within the required timelines as stipulated by the pooling and servicing agreement.

24. Here, Plaintiff alleges that the "true sale" never took place due to the failure to follow the basic legal requirements for the transfer of a negotiable instruments under the Rules Governing the Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities "FAS140" and thereby, Defendant BONYM did not acquire any legal, equitable, and pecuniary interest in the Plaintiffs' Note and Mortgage. As a result, therefore, BofA which purports to be the Plaintiffs' Creditor, actually has no secured or unsecured right, title, or interest in the Plaintiffs' Note and Mortgage, and has no right to collect mortgage payments, demand mortgage payments, or report derogatorily items against the Plaintiffs' credit[5], or to default the

---

[5] Plaintiff's allegations are supported by the recent ruling of the Massachusetts Supreme Judicial Court in *U.S. Bank vs. Ibanez, SJC-10694, 2011 WL 38071.In Ibanez*, the court invalidated two foreclosure sales, finding that the lower court did not err in concluding that the securitization documents submitted by U.S. Bank and Wells Fargo failed to demonstrate that they were the holders of the mortgages. The court reject the banks argument that the mortgages were transferred via the applicable Pooling and Servicing Agreement and made clear that ,to foreclose , the banks must prove a complete and unbroken chain of

Plaintiff.   Furthermore; the FAS-140 rules are used by the United States Treasury as to the evaluation and extinguishment of the Troubled Assets as set forth in the Economic Stabilization Act of 2008 Under [12 U.S.C.§5201 ET SEQ.] ; as such the importance of complying with such procedure is essential.

25.  The Plaintiff further alleges that, on information and belief, the BONYM cannot act as a Collector, Servicer, Creditor or Beneficiary as the Trust that purportedly contained the Certificates was dissolved and terminated due to the Economic Stabilization Act of 2008 under [12 U.S.C. §5201 ET SEQ.] and the purported "Assignment of the Deed of Trust" is a fabrication of a false document by Defendant BofA to collect subrogation payments from the Troubled Asset Relief Program (hereafter; TARP).

26.  Despite the procedural requirements and the rules governing the proper accounting procedures Governing the Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities "FAS-140" and Federal and State laws overseeing the compliance of such transactions, the Defendants attempt to take advantage of the complex structured financial system to defraud the Plaintiffs as they have done with millions of other homeowners from the inception of the meltdown.  Plaintiff anticipates that the Defendants and their counsel will seek a Court-Sanctioned bailout by submitting a blatantly fabricated "Assignment" or a copy of the Deed of Trust and the Note that does not reflect any information or proof that the Defendants are the true Assignees or Beneficiaries via a Request for Judicial Notice, thereby committing fraud on the court, and attempting to further mislead Plaintiff that the Defendants BONYM and/or BofA and Recontrust are actual creditors, and are entitled to enforce their alleged obligation.

27.  The Plaintiff does not dispute that he owes an amount on his alleged mortgage obligation[6].   Rather, Plaintiff disputes the Defendants claims as to having the legal right and the

title from origination to securitization trust in full compliance of the PSA, i.e. establish ownership of the mortgage.

[6]  However, simply because plaintiffs do not dispute the fact, the court should not condone Bank of America N.A.; and Recontrust Company N.A.s' fraudulent behavior and predatory mortgage collection practices and allow it to collect on money it was not owed.  Simply put, the court should not allow the defendants to trample over 200 years of well-settled property laws just because the "owes somebody money."

ownership interest that has been disclosed and contradicted by the Defendant BofA on multiple occasions as to the purported Debt and Mortgage "the Loan", and seeks the Court's assistance in determining who the holder in due course is of his alleged Note and alleged Deed of Trust, and specifically what rights, if any , the Defendants have to claim a secured or unsecured interest in the Plaintiffs' alleged Note or alleged Mortgage "the Loan".

28.   The Plaintiffs' information and belief is based on (1) Detailed analysis of the Property's title records (2) The analysis of the Mortgage documents on record and with escrow (3) The detailed study and review of the *Economic Stabilization Act of 2008* passed by congress (4)  The Plaintiff  has also conducted a detailed study of the ongoing events with respect to "Legacy Assets", "Legacy Securitization Program", "Legacy Loan Programs"  and other offerings by the respective governing agencies to entities such as the Defendant BofA (The Collector of the alleged debt) (5) an audit of BofA's filings with the Securities and Exchange Commission ("SEC"), including the trust's 424(b)(5)Prospectus and the Pooling and Servicing Agreement ("PSA") (6) BofA's balance sheet and other collateral filed with the SEC as a public company and the FDIC.

29.   The Plaintiff is informed and alleges that the Defendants have assumed the alleged debts from parties unknown at this time through a "credit sale" transaction utilizing their credit as collateral[7].   The Defendants are debt collectors under the meaning of "debt collector" as stipulated by the "F.D.C.P.A*" 15 U.S.C.  § 1692 (a) (6)*; the Defendants are not the originators of the alleged debt; the Defendants also fall within the meaning of the "F.D.C.P.A" collecting alleged debts at the time that the alleged debts were in default.   In addition the Defendant does not show the purported debt on their balance sheet.  This means that the Defendant BofA is collecting on behalf of another as a debt collector and not an Assignee; in addition the Servicer cannot be treated as an Assignee of a debt when they are the Servicer of the alleged debt [see 15 U.S.C. § 1641 (f)(2) ].

---

[7]  "It has been settled beyond controversy that a national bank, under Federal law, being limited in its power and capacity, cannot lend its credit by nor guarantee the debt of another.  All such contracts being entered into by its officers are ultra vires and not binding upon the corporation."  It is unlawful for banks to loan his deposits

30.  On or about July 25, 2007 the Plaintiff executed a Note and Mortgage in favor of "Countrywide Home Loans, Inc." a mortgage banker that conducted financing of residential properties, obtaining an alleged loan on the property located at 11308 Blue Sage Drive, Sylmar, CA 91342.

31.  The Plaintiff is informed and alleges that "Countrywide Home Loans, Inc." never sold, transferred, assigned or granted their Note or Mortgage to the sponsor, depositor; the Defendants are merely third - party stranger to the alleged debt "the Loan" transaction. Furthermore, Plaintiff alleges that none of the Defendants or Doe Defendants can demonstrate or document that Plaintiffs' Note was ever endorsed, assigned or/and transferred to BONYM or BofA.   In fact, Plaintiff has requested for the Defendants BONYM and/or BofA and Recontrust to verify and validate his debt.   Although the information should be readily available to any mortgage servicer, BONYM and/or BofA and Recontrust have failed to provide any evidence to verify the owner and amount of the Plaintiffs' Mortgage or validate the claim to the Plaintiffs' debt obligation.

32.  The Plaintiff alleges that the parties involved in the alleged securitization and alleged transfer of the Plaintiffs' Note and Mortgage failed to adhere to section **2.01** of the PSA, which requires that Plaintiffs' Note and Mortgage be properly endorsed, transferred, accepted, and deposited with the Securitized Trust (or its custodian) on or before the "***closing date***" indicated on the Prospectus ; the "***closing date***" is the date by which all the Notes and Mortgages must be transferred into the "Common Law Trust".   The failure to do so results in the Note and Mortgage not being part the "Common Law Trust", such that is not a loan that neither BONYM and/or BofA and Recontrust can attempt to collect on.

33.  The Plaintiff alleges that the "Assignment" that was executed after the closing date of the trust; The dubious "Assignment" raises numerous red flags and further demonstrates that the Plaintiffs' Note and Mortgage were not deposited into the Trust by the closing date, and that the "Assignment" was fabricated in attempt to "paper over" the fatal securitization defects by individuals that commit these acts as a daily regimen.   The acts perpetrated by the individuals acting as the "Assistant Secretary of MERS" and the "Public Notary" as the purported witness

of the state was caused by the Defendant BofA and Recontrust as part of a scheme to defraud the United States Treasury and the Plaintiff by foreclosing and collecting TARP funds as an assigned agent of the Department of Treasury pursuant to 12 U.S.C.§5211(c)(2)(3).

34. The failure to deposit Plaintiffs' Note into the "Common Law Trust" before the closing date is a violation of the PSA and New York Trust Law. Consequently, the "Common Law Trust" and the purported trustee at the time which the Trust existed cannot claim any legal or equitable right, title, or interest in the Plaintiffs' Note and Mortgage; In addition BONYM and/or BofA as a Trustee, Collector, Servicer, Assignee, or alleged Beneficiary cannot take any action which is not authorized by the Securitization agreements that created and govern the "Common Law Trust".

35. The Plaintiff does not allege or assert that he is the beneficiary or party to the PSA. Rather, Plaintiff alleges that the failure to Securitize his Note and the subsequent fraudulent "Assignment" makes it impossible for BONYM, or "Common Law Trust" to claim, allege or assert that it was assigned, transferred or granted Plaintiffs' Note or Mortgage, or any interest therein, in any manner whatsoever. Plaintiff also alleges that the failure to Securitize his Note and Mortgage has resulted in an unperfected lien that Defendants can enforce in any manner whatsoever[8].

36. The Plaintiff in good faith relied on BofA's representation and has been damaged in the following ways: (1) the Plaintiff in good faith relied on the representations made by BofA employees and team members and became delinquent on his mortgage in order to be assisted for a Loan Modification as told by the customer representative and has lost multiple credit lines and has incurred delinquencies on his credit report  (2) the Plaintiff in good faith relied on Defendant

---

[8] These allegations are identical to those brought by the California Attorney General against Bank of America, BAC Home Loan Servicing, in which Attorney General Catharine Cortez Masto alleges that these entities engaged in unlawful and deceptive practices by misrepresenting to homeowners that they had the authority to foreclose despite the fact that these were fatal deficiencies in transfers to the securitization Trusts, State of *California vs. Bank of America et al.*, No.3:11-ev-00135-RJD,(C.D. New August 30, 2011). The AG concludes that, "[t]hese are mere technicalities. The PSA's spelled out specific procedures in order to ensure a proper transfer, protect the Trusts as the holders in due course, and avoid subjecting the Trusts to taxation. In addition, borrowers need to know the actual holders of his mortgages so that, for example, they can investigate and assert available defenses in foreclosures, including that the agent of the trustee lacks authority or standing under the Note."*Id* at ¶ 146.

BofA's representation as being the purported Creditor, Owner, Servicer, or Beneficiary and entered into a contract for loan modification that was soon after breached by the Defendant BofA in an attempt to redirect funds into accounts that were not part of the alleged loan servicing system  (3)  the Plaintiff in good faith relied on the representation of the Defendant BofA and entered into an agreement for Loan Modification that was intentionally breached so that the Defendant could illegally foreclose on the Plaintiffs' "Property" in order to collect *TARP* funds pursuant and in violation of [12 U.S.C.§5211(e)] in order to be unjustly enriched. (4)  multiple parties may seek to enforce their alleged debt obligation against his ; (5)  the title to the Plaintiffs' home has been clouded and rendered unmarketable (unless more fraudulent actions are taken to show the foreclosure proceedings as proper and legal),  as any would be buyer of the Plaintiffs' property will find themselves in legal limbo, unable to know with any certainty whether they can safely buy the Plaintiffs' property or get title insurance; (6)  the Plaintiff has paid fees in amounts unknown to  the wrong party and other payments for an undetermined amount of time and overpaid in interest that was over calculated;  (7)  the Plaintiff is unable to determine whether he sent his monthly mortgage payments to the right party;   (8)  his credit worthiness has been destroyed due to the Defendants misreporting of alleged debts being delinquent without proper standing (9)  the Plaintiff has expended significant funds to cover the cost associated with processes involved, credit lines closed, legal fees and other fees paid to the wrong parties.

37.  In addition to seeking compensatory, consequential, punitive, and other damages, Plaintiff seeks Declaratory Relief as to the capacity of the Defendant to enter and execute contracts and whether the Deed of Trust (Mortgage) secures any, obligation of the Plaintiff in favor of Defendants BONYM, BofA and Recontrust, such that any of them can collect Plaintiffs' mortgage payments, demand payment or engage in debt collection activities.

///

///

///

///

## VI:  MERS ROLE AND WHY MERS DID NOT CAUSE THE
## ASSIGNMENT TO BE RECORDED

38.  MERS is listed as grantee in the official records at the county register of Deeds offices.  The lenders were supposed to retain the interest in the promissory Notes, as well as the servicing rights to the mortgages, **not MERS**.

39.  The Plaintiff alleges that MERS did not affect an "Assignment, transfer, negotiation, or sale of his Note and Mortgage" to any Defendant or Doe Defendant.

40.  The operative document defining MERS and its rights and functions is the Deed of Trust ("Deed of Trust or Trust Deed").  The Deed of Trust conveys a security interest and power of sale in the real property "real estate" to the lender only, **not MERS**[9].

41.  The Plaintiff is informed that MERS is merely an electronic registration system and not a true beneficiary, and did not Grant, Assign, or Transfer any true or pecuniary beneficial interest in the Plaintiffs' Note and Mortgage.  Contrary to the recitations contained in the fraudulent "Assignment of the Deed of Trust".  The Plaintiff alleges the following to be facts (1) MERS did not receive any "***Value***" or consideration for the Plaintiffs' Note and Mortgage, (2) MERS did not "Grant, Assign, or Transfer" any interest in the Plaintiffs' Note and Mortgage; and (3) signatory of the purported "Assignment of Deed of Trust", was/is not an "Assistant Vice President" for MERS at any time and lacked the requisite corporate and legal authority to effect an actual "Assignment" of the Plaintiffs' Note and Mortgage (MERS never had any legal, equitable, or pecuniary interest in the Plaintiffs' Note and Mortgage).

42.  The Plaintiff is informed that MERS own membership rules directly prohibit the company from ever claiming ownership of any mortgages or negotiable instruments, including the mortgage for the Plaintiff[10]  In fact, in September 2009 deposition, former President of

---

[9]  The Security Instrument secures to the Lender :(i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under the Security Instrument and the Note. For the purpose, Borrower irrevocably grants, conveys and warrants to Trustee, in trust, with power of sale, the following described property located in the County of Riverside: [legal description of the property] Deed of Trust ¶R.

[10]  A successor-in-interest to the beneficial interest in the trust Deed may choose to engage MERS as its agent by execution of a subsequent agreement, but MERS and its members cannot force MERS upon all future purchasers simply by claiming such authority in the original deed of trust.

MERS (R.K. Arnold) stated for the record that MERS does not have a beneficial interest in any mortgage, that it does not loan money, and that it does not suffer a default if a borrower fails to repay a mortgage loan[11]. Therefore, the evidence and testimony of the former President of MERS and the Plaintiffs' own history with MERS prove and show without a doubt that MERS does not own the Plaintiffs' Note and Mortgage, and did not "Grant, Assign, or Transfer" any interest therein to "BONYM, BofA, and/or Recontrust" or any other Doe defendants at any time. Furthermore; the alleged Assignment that has been executed and recorded with Los Angeles County Recorders' Office could have never actually happened before or there-after.

43. The Plaintiff is informed and alleges that the purported "Assignment" of the Plaintiffs' Note and Mortgage to "BONYM" is a fraudulent lien claim and in direct contravention of the laws and customs of California[12]. In fact; the purported "Assignment" was caused to be recorded by the Defendants BONYM, BofA and Recontrust Company as part of BONYM and BofA's desire to get paid by the TARP funds that have been allocated for the purchase of "*Troubled Assets*"; Defendants BofA and BONYM ordered the individuals employed by subcontractors acting as agents to fabricate and record the "Assignment Deed of Trust" and have been the driving force behind the illegal and fraudulent collection of the alleged debt.

44. Therefore, based on the foregoing, MERS did not, *in fact*, assign any interest to Defendants BONYM, BofA and/or Recontrust Company or any other Doe Defendants such that BofA and Recontrust Company can demand mortgage payments or report the Plaintiffs' payments as delinquent or attempt to foreclose on the Property.

---

[11] See video deposition of R.K. Arnold, *Henderson v. MERSCORP, Inc,* Civil Action No.CV-08-900805 (Ala.Cir.Sept.25 2009) available at http://www.stopforeclosurefraud.com/2010/05/29/full-deposition-of-mortgage-electronic-registration-systems-mers-president-ceo-r-k-arnold-merscorp/).
[12] Whatever 'necessary to comply with law or custom' means, and there is no evidence in the record to explain it. It should not mean that *U.S. bank or MERS'* can contract away his obligations to comply with foreclosure statues." *In re Salazar.*448 B.R.814.823 (finding that MERS system is not an alternative to statutory foreclosure laws. which "must be respected." and affirming that "if [t]his court ...joins the courts on other states that have rejected MERS' offer of an alternative to the public recording system.") *Id. at 824*

## VII: **PLAINTIFF HAS SUFFERED, AND CONTINUES TO SUFFER**
## **SIGNIFICANT MONETARY, LEGAL, AND EQUITABLE DAMAGES**

45. The conduct described above by BofA and Recontrust was/is malicious because Defendants knew that they were not acting on behalf of the current pecuniary beneficiary of the Note and Mortgage. However, despite such knowledge, said Defendants continued and continue to demand Plaintiffs' mortgage payments and are in the process of illegally attempting to collect on the alleged delinquent payments without having the legal right to do so.

46. The Defendants engaged and are engaging in a pattern of defrauding the Plaintiff, in that, on information and belief, during the entire life of the mortgage loan and the life of the loan modification, Defendants failed to properly credit payments made, incorrectly calculated interest on the accounts, allocated payments to accounts that did not exist and failed to accurately debit fees.

47. On information and belief , at all times material, BofA, had and has knowledge that Plaintiffs' accounts were not accurate, but that Plaintiff would continue to make future payments based on Defendants' representation of inaccurate accounts.

48. On information and belief, Plaintiff made payments on promises of a loan modification based on the improper, inaccurate, and fraudulent representations by Defendants.

49. As a direct and proximate result of the actions of the Defendants set forth above, Plaintiff overpaid in interest and principle during the "loan modification" period that the Defendants collected his payments.

50. As a direct and proximate result of the actions of the Defendants set forth above, Plaintiffs' credit worthiness and credit score have been severely damaged. Specifically, because of the derogatory credit reporting on his credit report by BofA as the purported servicer, the Plaintiff is unable to make use of his credit worthiness and to obtain any credit and now faces a hard road to recovery.

51. As a direct and proximate result of the actions of the Defendants set forth above, the title to the Plaintiffs' "Property" has been slandered, clouded, and its salability has been rendered unmarketable.

52. As a direct and proximate result of the actions of the Defendants set forth above, Plaintiff does not know who the current beneficiary of his alleged Note and Mortgage actually is, such that he is now subject to "double financial jeopardy".

53. As a direct and proximate result of the actions of the Defendants set forth above, *multiple* parties can attempt to enforce Plaintiffs' alleged debt obligations.

54. The conduct of BofA and Recontrust and one or more of the Doe Defendants has led to imminent loss of Plaintiffs' real property and pecuniary damages. The pecuniary damages include, but are not limited to, the cost of over calculation and overpayment of interest and principle, the cost of repairing Plaintiffs' credit, the reduction and/or elimination of Plaintiffs' credit limits, the cost associated with removing the cloud from his property title and attorney fees, the amount monies paid during the loan forbearance period which was misappropriated by the Defendants and other damages in an amount to be proven at trial.

55. The conduct of BofA and Recontrust and one or more of the Doe Defendants' conduct was malicious because Defendants did not know the identity of the current and true Beneficiary of Plaintiffs' Note and Deed of Trust, yet they intentionally and fraudulently covered up the defect by wrongfully recording a fraudulent "Assignment of Deed of Trust" which would be enable them to *illegally and fraudulently* collect on Plaintiffs' debt, and which in essence has rendered the title the "Property" unmarketable.

56. The title to Plaintiffs' Property has been rendered unmarketable and useable because of the possibility of multiple claims made against Plaintiffs' alleged debt obligation and the underlying security (the subject property). If the "Assignment of the Deed of Trust" is not cancelled and set aside, Plaintiff will be incurably prejudiced. Plaintiff will be denied the opportunity to identify and negotiate with the *true creditor* and exercise his right and due process to verify and validate his alleged debt.

57. The Plaintiff has not offered to and has not submitted the unconditional tender to his alleged obligation[13] as the Plaintiff has a genuine dispute against Defendants alleged claims to

---

[13] Case law makes it clear that **Plaintiff is only required to allege a credible offer of tender**, not actually tender. *Alicia v. GE Money Bank*, No C 09-00091 SBA, 2009 WL 21336969 at *3(N.D. Cal. July 16, 2009) (...debtor must allege a credible tender of the amount of the secured debt..."). Moreover,

the beneficial interest and standing in the alleged debt and mortgage "the Loan". The Plaintiff is informed and re-alleges that the Defendants are misrepresenting the alleged debt/mortgage "the Loan"; the debt has been satisfied and the Defendants have been/will be enriched unjustly by their assertions on the alleged debt.

## VIII: FIRST CAUSE OF ACTION - BREACH OF CONTRACT

### [Against Defendant BofA]

58. The Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

59. The Plaintiff is informed and alleges that Defendant BofA has breached the terms of the loan modification process through inducement, misrepresentation, and unjust enrichment; the Defendant induced the Plaintiff by representing to the Plaintiff that he would be eligible if he continued to pay until such time that the servicer would consider him for a modification. The Defendants collected and requested information from the Plaintiff on the premise that they are the party with the legal rights to extend and offer an amended modification clause to the original Note; the Defendants reviewed financial and personal information of the Plaintiff in order to make their decision without taking into account the net present value calculations as required by the Department of Treasury pursuant to [12 U.S.C. § 5219(a) (1) under section 1715z-23].

60. The Plaintiff was offered a Trial Loan Modification Program which at the time exceeded 31% of the Plaintiffs' reported income pursuant to the Foreclosure Mitigation stipulation within [12 U.S.C. § 5219].

61. The Defendant BofA also failed to calculate the escrow amounts paid on behalf of the Plaintiff and to properly amortize the amounts due into the Loan Modification approval

---

tender is *not* required when the owner's action attacks the validity of the underlying debt because the tender would constitute an affirmation of the debt. *Sacchi v. Mortgage electronic registration systems, Inc.* No.CV 11-1658 AHM, 2011 WL 25330299 (C.D. Cal June 24, 2011), 148 Cal. App. 2d 558,564 (1957). See also, *Foulkord v. Wells Fargo Financial California Inc.,* No. CV 11-732-GHK (AJWx)(C.D. Cal May 31,2011)("...requiring plaintiff to tender the amount due on his loan at the time would be *illogical and inequitable* given that he disputes that Wells Fargo has any rights under the loan.") In light of the fact that Plaintiff contents the legitimacy of the Defendants' claim to the mortgage payments, it would be *illogical and inequitable* to require Plaintiff to actually tender the amount given that Plaintiff disputes whether Defendants have any rights under the loan. See *Onofrio v. Rice*, 55 Cal. App. 4th 413,424(1997).

process; as such these amounts were calculated into the increased principle amount and again recalculated into the escrow amounts due to be paid within a 6 month amortized schedule.

62. The Defendant misrepresented themselves as the creditor of the debt and through their representation attempted to induce the Plaintiff into an agreement which did not meet the required perimeters of the Department of Treasury (hereafter, DOT) pursuant to [12 U.S.C.§ 5219] ; the Plaintiff alleges that the Defendant did not follow the protocol set forth by the DOT as the Defendants true intentions were to collect any amounts possible and to move forward with the disposition of the Property as means sanctioned by the DOT to qualify for the TARP Funds .

63. The Plaintiff is informed and alleges that BofA's business practice of misleading and foreclosing on the Property provides the Defendant with a much greater return in a shorter amount of time; as such Defendant BofA has a greater incentive to induce Plaintiff and others into loan modification agreements without adhering to the requirements as set forth by the DOT. The Defendants also through the practice creates the perception of a compliant process for which they will qualify for the collection of TARP funds "*__TARP Vouchers__*" from the DOT in the form of Treasury Bills or Receivable Notes from the Federal Reserve.

64. The Plaintiff does not allege that the operation of the DOT or the Board of Federal Reserve (hereafter, the Board) are incorrect; as a matter of fact the Plaintiff is informed that the Board themselves have conducted an in depth investigation which confirms the Plaintiffs' allegations of misconduct by the hired agents (Collectors, and the top Servicers of Securities) (**See Exhibit A**, herein incorporated is a true copy of the findings of the Board).

65. The Plaintiff is informed and alleges that the Defendants practices in the approval of loan modification is a strategy to become unjustly enriched by collection of the most amount of monies possible from the Plaintiff and others in similar circumstances before the inevitable default of the agreement and the Defendants' move to take disposition of the Property.

66. The Plaintiffs' failure to continue with the modification application was caused by the Defendant BofA's intentional misallocation of the collected funds during the loan modification application and the subsequent misrepresentation of facts.

The Defendant BofA caused the misallocation of funds to create a situation by which the Defendant could ask for additional funds and to accelerate "the Loan".

67. The Plaintiff also alleges that the methods used by the Defendant BofA are not legal and consistent with a Servicer; but rather consistent with a "Debt Collector"; the Debt Collector's practice is to collect as much funds from obliges and to keep those funds as fees for their service. Also; the acceptable method of accounting as stipulated by the "Federal Fair Billing Act" is for the servicer of "Consumer Credit" to collect the funds and to allocate them as follows: (a) All amounts of interest due to be paid first (b) The remaining balance should be allocated to the principle amounts due (c) Any additional funds to cover the late fees or escrow amounts due, which the Servicer did not do as they are collectors.

68. The Plaintiff alleges that the Defendant BofA has violated their agreed covenants within the loan modification process as stipulated by the Department of Treasury; the Defendant has collected monies and misallocated the funds with the intention of unjust enrichment as a result of the misallocation of the funds and the subsequent foreclosure process which would allow for TARP funds to be paid to Defendant BofA as an agent of collection.

69. Furthermore, the conduct of BofA and Recontrust as their agent and one or more of the Doe Defendants, and each them, as herein described has been malicious and intentional in order to take disposition of the Plaintiffs' Property. The Defendant BofA and Recontrust and one or more Doe Defendants did not follow the exact procedures as set forth by the "DOT" Department of Treasury in an effort to enrich themselves without consideration of laws and legislations that have given them their unchecked powers. Plaintiffs have been damaged in the amount of funds paid to Defendant BofA and other damages due to his disregard for compliance; therefore the Plaintiffs are entitled to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in similar conduct. The Plaintiff also asks the court to issue orders to stop the Defendants and Doe Defendants from any further action related to the Property.

///

///

## IX: SECOND CAUSE OF ACTION-DECLARATORY RELIEF:
## TO DETERMINE STATUS OF DEFENDANTS' CLAIMS [28 U.S.C.§§ 2201,2202]
### [Against All Defendants and Doe Defendants]

70. The Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

71. Section 2201(a) of Title 28 of the United States Code states:

**"In case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an anti dumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether, or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."**

72. Section 2202 of Title 28 of the United States Code states:

**Further this necessary or proper relief based on declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.**

73. Plaintiff alleges that neither BofA and/or BONYM have a secured or unsecured legal, equitable, or pecuniary interest in the lien evidenced by the Deed of Trust and that its purported assignments have no value since the Deed of Trust is wholly unsecured.

74. On or about July 25, 2007 the Defendants claim they had secured enforceable interest in, and perfected lien against, the Plaintiffs' Note, deed of Trust and Property.

75. Thus, the competing allegations made by Plaintiff, above, establish that a real and actual controversy exists as to the respective rights of the parties to the matter, including ownership of the Property.

76. Accordingly, Plaintiff requests that the Court make a finding and issue appropriate orders stating that none of the named Defendants or Doe Defendants, have any right or interest in Plaintiffs' Note, Deed of Trust, or the Property which authorizes them, in fact or as a matter of law, to collect Plaintiffs' mortgage payments or enforce the terms of the alleged Note or Deed of Trust in any manner whatsoever.

77. The Plaintiff will suffer prejudice if the Court does not determine the rights and obligations of the parties because: (1) Plaintiff will be denied the opportunity to identify his true and current creditor/lender and to negotiate with them; (2) Plaintiff will be denied the right to conduct discovery and have BofA and other Defendants' claims verified by a custodian of records who has personal knowledge of the loan and all transactions related to it; and (3) Plaintiff will be denied the opportunity to discover the true amount he still owes minus any legal costs, fees and charges.

78. Due to the actual case and controversy regarding competing claims and the allegations, it is necessary that the court declare the actual rights and obligations of the parties and make a determination as to whether BofA and other Defendants' claims against the Plaintiff are enforceable and whether it is secured or unsecured by any right, title, or interest in Plaintiffs' property.

79. Furthermore, the conduct of BofA and Recontrust as their agent, and one or more of the Doe Defendants, and each them, as herein described, has been so malicious and contemptible that it would be looked down upon and despised by ordinary people. Plaintiff is therefore entitled to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in similar conduct.

## X: THIRD CAUSE OF ACTION - NEGLIGENCE

### [Against All Defendants and Doe Defendants]

80. The Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

81. At all times relevant herein, BofA was acting as a purported agent for parties unknown at the time. Defendants are jointly and severally liable for BofA and Recontrust, negligent and reckless conduct.

82. Defendant BofA as the purported beneficiary of the Note and Deed of Trust has a duty to exercise reasonable care[14] and skill to follow California law with regard to enforcement of monetary obligations, and to refrain from taking or failing to take any action against Plaintiff that they did not have the legal authority to do. This includes not collecting or demanding mortgage payments when they do not have the right to enforce the obligation, causing the Plaintiff to overpay in interest, entering into a contract for the sole purpose of maximizing profits without proper considerations as set forth by the DOT , making derogatory credit reports to credit bureaus, and failing to keep an accurate accounting of Plaintiffs' mortgage payments, credits, and debits (if BofA is in fact the legally authorized mortgage servicer for the Plaintiff).

83. BofA has a duty to exercise reasonable care and skill to refrain from taking any action against Plaintiff that they do not have the legal authority to do. As a direct and proximate result of the reckless negligence, utter carelessness, and blatant fraud of the Defendants as set forth above, the chain of title to Plaintiffs' property has been rendered unmarketable and fatally defective and has caused Plaintiff to lose saleable title to the subject property.

84. BofA breached its duty when they failed to follow the guidelines established by the DOT requiring the proper due diligence to be done before the offering of loan modification proposal and the subsequent actions taken by the Defendant in order to accelerate the loan for the purpose of dispossessing the property from the Plaintiff.

85. As a direct and proximate result of the negligence and carelessness of the Defendants as set forth above, Plaintiff suffered, and continues to suffer, general and special damages in an amount to be determined at trail, including attorneys' fees and costs of bringing suit to dispute,

---

[14] Normally lenders and servicers do not owe a borrower a duty of care. *Nymark v. Heart Fed. Savings & Loan Assn.*, 231 Cal. App.3d 1089, 1093 (1991). However, a bank may be liable in negligence if it fails to discharge its contractual duties with reasonable care. Das v. bank of Am, 186 Cal.App.4th 727,741 (2010). Additionally, a bank may be liable for aiding and abetting a tort when it renders "substantial assistance" to a tortfeasor during a business transaction that it knowingly aided in the commission of the tort. Id (citing *Casey v. U.S. Bank Nat .Assn.* 127 Cal. App. 4th 1138, 1144-45).

validate, and challenge said Defendants' purported rights to enforce the Plaintiffs' alleged debt obligation against them.

## XI: FOURTH CAUSE OF ACTION-QUASI CONTRACT

### [Against All Defendants and Doe Defendants]

86. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

87. BofA demanded monthly mortgage payments from Plaintiff and continued to collect payments from Plaintiff. Plaintiff reasonably relied upon BofA's assertion that it/they are/were entitled to the benefit of Plaintiffs' mortgage payments.

88. BofA knowingly accepted payments and retained them for its own use knowing that BofA did not acquire an interest in Plaintiffs' Note, such that they could accept or keep Plaintiffs' payments. It would be inequitable for BofA to retain the payments it received from Plaintiff which it did not have legal authority to collect. The equitable remedy of restitution when unjust enrichment has occurred is an obligation created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his former position by return of the thing or its equivalent in money.

89. Plaintiff seeks restitution for any payments were made to BofA and those that were not paid to the Lender or the true Beneficiary, if any.

## XII: FIFTH CAUSE OF ACTION – VIOLATION OF 15 U.S.C. § 1692, ET SEQ.

### [Against All Defendants and Doe Defendants]

90. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

91. Federal law prohibits the use of any "any false, deceptive, or misleading representation or means in connection with the collection of any debt; including the false representation of "the character, amount, or legal status of any debt" and the threat to take any action that cannot legally be taken…"; Defendant BofA has communicated to the Plaintiff by and through federal disclosures on four different occasions that they are "Debt Collectors and all information gathered will be used in collecting the Debt", the Defendant has also purported

themselves to be the "creditor" of the alleged debt on more than two different occasions and has contradicted their own statement as being the "creditor" through a federal disclosure under "RESPA".

92. In illegally attempting to collect on Plaintiffs' debt obligation in the manner described herein, Defendant BofA as the purported assignee[15], and Recontrust as purported Trustee: falsely represented the status of the debt, in particular, that it was due and owing to Defendant BONYM at the time the suit was filed; falsely represented or implied that the debt was owing to Defendants BONYM as an innocent purchaser *for value*, when in fact, such an assignment had not been accomplished; threatened to take action, namely engaging in collection activities that cannot legally be taken by them; and attempted to collect on the promissory note under false pretenses; namely that BONYM was assigned Plaintiffs' debt when in fact they were not.

93. Illegally collecting on alleged debts that were in default. "The Senate report emphasized the application of the section 15 U.S.C. § 1692(a) §§ 4.3.10 to mortgage service companies and others who service outstanding debts for others, so long as the debts were not in default when taken for servicing. The Defendants violated the statute by his alleged assignments being filed many months after the debt had been in default. The Defendant BofA disclosed that they are the new "Servicer" of the alleged debt in the Assignment and delivered to Plaintiff approximately 24 months after the alleged debt had become delinquent;  the Defendants actions were illegal in his attempts to collect on the alleged debts as debt collectors claiming to be beneficiaries and creditors of the alleged debt.

94. The Defendants have misrepresented the "character, amount and the legal status of the alleged debt" along with attempting to collect on defaulting debts on behalf of others.   The Defendant BofA or other Doe Defendants have misrepresented their roles and have attempted to deceive the Plaintiff into believing that they are the legal owners of the debt.  The Defendants actions has induced the Plaintiff into becoming delinquent on payments that they had/have no

---

[15] [15 U.S.C § 1641 (f)(1)] Treatment of Servicer: A Servicer of a consumer obligation arising from a consumer credit transaction shall not be treated as an assignee of such obligation for the purposes of the section unless the servicer is/ was the owner of the obligation.

right to collect; they have caused the Plaintiff to enter into a contract which the Defendant had no intention of honoring; in addition the Defendants' actions have caused the Plaintiff creditworthiness and credit standing to be damaged by the misreporting of delinquencies that were caused by the Defendants.

95.   Thus, BofA violated 15 U.S.C. § 1692 et seq., and its subject to statutory damages, civil liability, penalties, attorneys' fees and actual damages. *See* 15 U.S.C. § 1692. The actual pecuniary damages include, but are not limited to, the over calculation and overpayment of interest and principle on Plaintiffs loan, the costs of repairing Plaintiffs credit, the reduction and/or elimination of Plaintiffs' credit limits, costs associated with removing the cloud on his property title and setting aside the trustee's sale, and attorneys' fees and costs, in an amount to be proven at trial, but in excess of $75,000.00.

96.   As a direct and proximate result of the violations of Fair Debt Collection Practice Act by BofA and Recontrust; Plaintiff has suffered actual pecuniary damages, including but not limited to statutory damages, civil liability, and attorneys' fees, in an amount to be proven at trial.

## XIII: SIXTH CAUSE OF ACTION – VIOLATION OF
## BUS. AND PROF. CODE SECTION

### [Against All Defendants and Doe Defendants]

97.   Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

98.   Defendants' conduct, for the reasons stated herein, is in direct violation of 12 U.S.C. § 2605(e), et seq.

99.   Defendants' conduct, for the reasons stated herein, is in direct violation of A.B. 284 Chapter 81.

100.   Bus and Prof. Code Title 54 , prohibits acts which includes any unlawful, unfair, or fraudulent business act and conduct which is likely to deceive and is fraudulent in nature.

101.   As more fully described above, Defendants' acts and practices are unlawful, unfair, and fraudulent. The conduct is ongoing and continues to the date.

102. Defendants engage in unfair, unlawful[16], and fraudulent business practices with respect to mortgage loan servicing, and related matters by, among other things:

    a) Executing and recording false and misleading documents[17];

    b) Executing and recording documents without the legal authority to do so;

    c) Using other corporate names and individuals to commit fraud

    d) Using individuals to file and record paperwork that is fraudulent

    e) Failing to disclose the principal for which documents were being executed and recorded A.B. 284 chapter 81;

    f) Demanding and accepting payments for debts that were non-existent;

    g) Violating the Security First Rule;

    h) Entering into contracts that they know is set up to fail

    i) Collection and intentional misallocation of funds

    j) Disclosing themselves as multiple parties that claim to have pecuniary rights and legal rights to the property

    k) Reporting payments as late to credit bureaus without the legal right or authority to do so;

    l) Failing to file the required disclosures under federal law

    m) Failing to answer the inquires of the Plaintiff as afforded by law

    n) Submitting false reports to the DOT as to his activities involving the servicing and collection of funds

    o) Acting as beneficiary without the legal authority to do so, and;

    p) Other deceptive business practices as described herein.

---

[16] "Unlawful" acts or practices are those forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, or court-made. *Sanders v. Superior court*, 27 Cal.4th 832(1994); *Hewlett v. Squaw Valley*, 54 Cal.4th 499(1997).

[17] Defendants' recording of the Assignment of Deed of Trust violates Cal. Penal Code section 532 (f)(a)(4), which prohibits any person from filing a document related to a mortgage loan transaction with the county recorder's office which that person knows to contain a deliberate misstatement, misrepresentation, or omission. The facts demonstrate that Defendants have committed mortgage fraud by filing the Assignment of Deed of Trust with the county recorder's office with the knowledge that the document contained a deliberate misstatement, misrepresentation, or omission of fact.

103. As more fully described above, Defendants' acts and practices are likely to deceive members of the public.

104. Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein; Defendants violate several laws including and must be required to disgorge all profits related to his unfair, unlawful, and deceptive business practices.

105. Plaintiff alleges that Defendants' misconduct, as alleged herein, gave Defendants an unfair competitive advantage over competitors. The scheme implemented by Defendants is designed to defraud California consumers and enrich the Defendants.

106. The foregoing acts and practices have caused substantial harm to California consumers, including Plaintiff.

107. By reason of the foregoing, Defendants have been unjustly enriched and should be required to make restitution to Plaintiff and other California consumers who have been harmed, and/or be enjoined from continuing in such practices.

108. As a direct and proximate result of the actions of Defendants, and each of them, stated above, Plaintiff has been injured in that a cloud has been placed upon Title to Plaintiffs' Property and Defendants have failed to remove the cloud from Plaintiffs' Title.

109. Plaintiff is entitled to an order compelling BofA, BONYM and/or any other Doe Defendants claiming an interest in and to the property to take any and all actions necessary to remove the cloud they have placed upon their title and an order enjoining such Defendants from taking such action again in the future.

## XIV: WHEREFORE, PLAINTIFFS' PRAYERS ARE AS FOLLOWS:

1. For compensatory, special and general damages in an amount according to proof at trail, but not less than $ 5,000,000.00, against all Defendants;

2. For punitive and exemplary damages in an amount to be determined by the Court against all Defendants;

3. For an order compelling Defendants to remove any instrument which does or could be construed as constituting a cloud upon Plaintiffs' title to the Property, including the purported "Assignment of Deed of Trust";

4. For an order finding that Defendants have no legally cognizable rights as to Plaintiff, the Property, Plaintiffs' Promissory Note, Plaintiffs' Deed of Trust or any other matter based on contract or any of the documents prepared by Defendants, tendered to and executed by Plaintiff;

5. For the Court to issue an order restraining Defendants, their agents or employees from continuing or initiating any action against the Property and enjoining Defendants, their agents or employees from doing so during the pendency of the matter;

6. For an order compelling Defendants to disgorge all amounts wrongfully taken by them from Plaintiff and returning the same to Plaintiffs' interest thereon at the statutory rate from the date the funds were first received from Plaintiffs;

7. For an order compelling Defendants to cancel any ongoing foreclosure proceeding and to remove the Property from any foreclosure database.

8. For the Defendants to remove all derogatory items reported on the Plaintiffs credit reports.

9. For costs of suit incurred herein;

10. For reasonable attorneys' fees incurred; and

11. The Court to order an ADR for the purpose of granting the Plaintiff the long overdue loan modification.

12. For such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

The Plaintiff Warren M. Chadwick Jr.; hereby requests a jury trial on all issues raised in the complaint under the Seventh Amendment to the U.S Constitution in accordance with "Federal Rule of Civil Procedure 38."


Dated: 12/2/2012


Warren M. Chadwick Jr.,
Plaintiff in pro per
*Without Recourse*

**LIST OF EXHIBITS**

Pursuant to *18 U.S.C. 1961(9),* Plaintiff now formally incorporates His *documentary material* by reference to all of the following Exhibits, as if set forth fully here, to wit:

The number of pages shown includes the cover page:

Exhibit A - Interagency Review of Foreclosure Policies and Practices of the Federal Reserve – 18 pages

Total number of Exhibit pages attached – 18

## **VERIFICATION**

I, Warren M. Chadwick Jr., Plaintiff in the above entitled action, hereby verify under penalty of perjury, under the laws of the United States of America, without the "United States" (federal government), that the above statement of facts and laws is true and correct, according to the best of my current information, knowledge, and belief, so help me God, pursuant to 28 U.S.C. 1746(1). See the Supremacy Clause in the Constitution for the United States of America, as lawfully amended (hereinafter "U.S. Constitution").

Dated: 12/26/2012 .


Warren M. Chadwick Jr.,
*Sui Juris*
*Without Recourse*

## ACKNOWLEDGEMENT

State of California

County of ( *Los Angeles* )

On *December 26th, 2012* before me *Elizabeth Aghvinian,*
*Notary Public.*

Personally appeared *Warren M. Chadwick, Jr.* , who proved to me on the

basis of satisfactory evidence to be the person(s) whose name(s) is / are subscribed to the within

instrument and acknowledgement to me that he / she / they executed the same in *his* / her / their

authorized capacity (ies), and that by *his* / her / their signatures(s) on the instrument the

person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the state of California that the

foregoing paragraph is true and correct.

WITNESS my hand and official seal.

ELIZABETH AGHVINIAN
COMM. # 1990109
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Commission Expires Sept. 29, 2016

Signature *Elizabeth Aghvinian* (Seal)

# EXHIBIT "A"

# Interagency Review of Foreclosure Policies and Practices

Federal Reserve System

Office of the Comptroller of the Currency

Office of Thrift Supervision

  

WASHINGTON, D.C. • APRIL 2011

# Interagency Review
# of Foreclosure Policies
# and Practices

Federal Reserve System
Office of the Comptroller of the Currency
Office of Thrift Supervision

  

WASHINGTON, D.C.   •   APRIL 2011

# Contents

Executive Summary ................................................................................................... 1
   Review Scope and Objectives ............................................................................... 1
   Summary of Review Findings ................................................................................ 2
   Summary of Supervisory Response ...................................................................... 4

Part 1: Background and Risks Associated
with Weak Foreclosure Process and Controls ........................................................ 5
   Impact on Borrowers ............................................................................................ 5
   Impact on the Industry and Investors .................................................................. 6
   Impact on the Judicial Process ............................................................................ 6
   Impact on the Mortgage Market and Communities ............................................. 6

Part 2: Review Findings ......................................................................................... 7
   Foreclosure Process Governance ........................................................................ 7
   Organizational Structure and Availability of Staffing .......................................... 8
   Affidavit and Notarization Practices .................................................................... 8
   Documentation Practices ..................................................................................... 8
   Third-party Vendor Management .......................................................................... 9
     Arrangements with Outside Law Firms ............................................................ 9
     Arrangements with Default Management Service Providers (DMSPs) ........... 10
     Arrangements with Mortgage Electronic Registration Systems, Inc. ............. 10
   Ineffective Quality Control (QC) and Audit ........................................................ 11

Part 3: Supervisory Response ............................................................................. 13

Part 4: Industry Reforms ...................................................................................... 15
   Governance and Oversight ................................................................................ 15
   Organizational Structure, Staffing, and Technology ......................................... 15
   Accountability and Responsiveness Dealing with Consumers ......................... 15

# Executive Summary

The Federal Reserve System, the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision (OTS), referred to as the agencies, conducted on-site reviews of foreclosure processing at 14 federally regulated mortgage servicers during the fourth quarter of 2010.[1]

This report provides a summary of the review findings and an overview of the potential impacts associated with instances of foreclosure-processing weaknesses that occurred industrywide. In addition, this report discusses the supervisory response made public simultaneous with the issuance of this report, as well as expectations going forward to address the cited deficiencies. The supervisory measures employed by the agencies are intended to ensure safe and sound mortgage-servicing and foreclosure-processing business practices are implemented. The report also provides an overview of how national standards for mortgage servicing can help address specific industrywide weaknesses identified during these reviews.

## Review Scope and Objectives

The primary objective of each review was to evaluate the adequacy of controls and governance over ser-

vicers' foreclosure processes and assess servicers' authority to foreclose. The reviews focused on issues related to foreclosure-processing functions. While the reviews uncovered significant problems in foreclosure processing at the servicers included in the report, examiners reviewed a relatively small number of files from among the volumes of foreclosures processed by the servicers. Therefore, the reviews could not provide a reliable estimate of the number of foreclosures that should not have proceeded. The agencies, therefore, are requiring each servicer to retain an independent firm to conduct a thorough review of foreclosure actions that were pending at any time from January 1, 2009, through December 31, 2010, to, among other things, 1) identify borrowers that have been financially harmed by deficiencies identified in the independent review and 2) provide remediation to those borrowers where appropriate. These independent reviews will be subject to supervisory oversight to ensure that the reviews are comprehensive and the results are reliable.

For the reviews discussed in this report, examiners evaluated each servicer's self-assessments of their foreclosure policies and processes; assessed each servicer's foreclosure operating procedures and controls; interviewed servicer staff involved in the preparation of foreclosure documents; and reviewed, collectively for all servicers, approximately 2,800 borrower foreclosure files that were in various stages of the foreclosure process between January 1, 2009, and December 31, 2010.[2]

Examiners focused on foreclosure policies and procedures; quality control and audits; organizational structure and staffing; and vendor management,

---

[1] Agencies conducted foreclosure-processing reviews at Ally Bank/ GMAC, Aurora Bank, Bank of America, Citibank, EverBank, HSBC, JPMorgan Chase, MetLife, OneWest, PNC, Sovereign Bank, SunTrust, U.S. Bank, and Wells Fargo. The reviews included mortgage-servicing activities conducted by insured banks and thrifts, as well as by several nonbank affiliates of these organizations. The 14 servicers were selected based on the concentration of their mortgage-servicing and foreclosure-processing activities. The agencies typically do not disclose examinations or examination findings regarding particular institutions. In light of the formal enforcement actions entered into by these 14 servicers, which are being made public, the agencies have determined that it is appropriate to identify the servicers (whether a bank or a bank affiliate) that were reviewed. The bank and thrift holding company parents of Ally Bank/GMAC, Bank of America, Citibank, Everbank, HSBC, JPMorgan Chase, MetLife, OneWest, PNC, SunTrust, U.S. Bank, and Wells Fargo also entered into formal enforcement actions.

[2] Foreclosure files at each servicer were selected from the population of in-process and completed foreclosures during 2010. The foreclosure file sample at each servicer included foreclosures from both judicial and nonjudicial states. Review teams independently selected foreclosure file samples based on pre-established criteria (such as files for which consumer complaints had been raised, or those in geographic areas with high volumes of foreclosures) with the balance of the files selected based on examiner judgment.

including use of third-party vendors such as foreclosure attorneys, Lender Processing Services (LPS) and other default-service providers, and MERSCORP and its wholly owned subsidiary, Mortgage Electronic Registration Systems, Inc. (MERS). Based on their reviews of the limited number of foreclosure-file samples, examiners also assessed the accuracy of foreclosure-related documentation, including note endorsements and the assignments of mortgages and deeds of trust, and loan document control.[3] With respect to those files, examiners also assessed whether fees charged in connection with the foreclosures exceeded the amounts reflected in the servicers' internal records. In addition, the Federal Reserve and the OCC solicited views from consumer groups to help detect problems at specific servicers, and the Federal Reserve expanded the file sample to include borrowers who were delinquent, but not yet in foreclosure.

The file reviews did not include a complete analysis of the payment history of each loan prior to foreclosure or potential mortgage-servicing issues outside of the foreclosure process. Accordingly, examiners may not have uncovered cases of misapplied payments or unreasonable fees, particularly when these actions occurred prior to the default that led to the foreclosure action. The foreclosure-file reviews also may not have uncovered certain facts related to the processing of a foreclosure that would lead an examiner to conclude that a foreclosure otherwise should not have proceeded, such as undocumented communications between a servicer employee and the borrower in which the employee told the borrower he or she had to be delinquent on the loan to qualify for a modification. In addition, the reviews did not focus on loan-modification processes, but when reviewing individual foreclosure files, examiners checked for evidence that servicers were in contact with borrowers and had considered alternative loss-mitigation efforts, including loan modifications.

To ensure consistency in the reviews, the agencies used standardized work programs to guide the assessment and to document findings pertaining to each servicer's corporate governance process and the individual foreclosure-file reviews. The work programs were organized into the following categories:

- **Policies and procedures.** Examiners reviewed the servicers' policies and procedures to see if they provided adequate controls over the foreclosure process and whether those policies and procedures were sufficient for compliance with applicable laws and regulations.

- **Organizational structure and staffing.** Examiners reviewed the functional unit(s) responsible for foreclosure processes, including their staffing levels, their staff's qualifications, and their training programs.

- **Management of third-party service providers.** Examiners reviewed the servicers' oversight of key third parties used throughout the foreclosure process, with a focus on foreclosure attorneys, MERS, and default-service providers such as LPS.

- **Quality control and internal audits.** Examiners assessed quality-control processes in foreclosures. Examiners also reviewed internal and external audit reports, including government-sponsored enterprise (GSE) and investor audits and reviews of foreclosure activities as well as servicers' self-assessments.

- **Compliance with applicable laws.** Examiners checked the adequacy of the governance, audits, and controls that servicers had in place to ensure compliance with applicable laws.

- **Loss mitigation.** Examiners determined if servicers were in direct communication with borrowers and whether loss-mitigation actions, including loan modifications, were considered as alternatives to foreclosure.

- **Critical documents.** Examiners evaluated servicers' control over critical documents in the foreclosure process, including the safeguarding of original loan documentation. Examiners also determined whether critical foreclosure documents were in the foreclosure files that they reviewed, and whether notes were endorsed and mortgages assigned.

- **Risk management.** Examiners assessed whether servicers appropriately identified financial, reputational, and legal risks and whether these risks were communicated to the board of directors and senior management of the servicer.

## Summary of Review Findings

The reviews found critical weaknesses in servicers' foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys. While it is important to note that findings

---

[3]   For purposes of this report, default management services generally include administrative support and services provided to the servicers by third-party vendors to manage and perform the tasks associated with foreclosures.

varied across institutions, the weaknesses at each servicer, individually or collectively, resulted in unsafe and unsound practices and violations of applicable federal and state law and requirements.[4] The results elevated the agencies' concern that widespread risks may be presented—to consumers, communities, various market participants, and the overall mortgage market. The servicers included in this review represent more than two-thirds of the servicing market. Thus, the agencies consider problems cited within this report to have widespread consequences for the national housing market and borrowers.

Based on the deficiencies identified in these reviews and the risks of additional issues as a result of weak controls and processes, the agencies at this time are taking formal enforcement actions against each of the 14 servicers subject to this review to address those weaknesses and risks. The enforcement actions require each servicer, among other things, to conduct a more complete review of certain aspects of foreclosure actions that occurred between January 1, 2009, and December 31, 2010. The specific supervisory responses are summarized in Part 3 of this report.

The loan-file reviews showed that borrowers subject to foreclosure in the reviewed files were seriously delinquent on their loans. As previously stated, the reviews conducted by the agencies should not be viewed as an analysis of the entire lifecycle of the borrowers' loans or potential mortgage-servicing issues outside of the foreclosure process. The reviews also showed that servicers possessed original notes and mortgages and, therefore, had sufficient documentation available to demonstrate authority to foreclose. Further, examiners found evidence that servicers generally attempted to contact distressed borrowers prior to initiating the foreclosure process to pursue loss-mitigation alternatives, including loan modifications. However, examiners did note cases in which foreclosures should not have proceeded due to an intervening event or condition, such as the borrower (a) was covered by the Servicemembers Civil Relief Act, (b) filed for bankruptcy shortly before the foreclosure action, or (c) qualified for or was paying in accordance with a trial modification.[5]

The interagency reviews identified significant weaknesses in several areas.

- **Foreclosure process governance.** Foreclosure governance processes of the servicers were underdeveloped and insufficient to manage and control operational, compliance, legal, and reputational risk associated with an increasing volume of foreclosures. Weaknesses included:

  - inadequate policies, procedures, and independent control infrastructure covering all aspects of the foreclosure process;

  - inadequate monitoring and controls to oversee foreclosure activities conducted on behalf of servicers by external law firms or other third-party vendors;

  - lack of sufficient audit trails to show how information set out in the affidavits (amount of indebtedness, fees, penalties, etc.) was linked to the servicers' internal records at the time the affidavits were executed;

  - inadequate quality control and audit reviews to ensure compliance with legal requirements, policies and procedures, as well as the maintenance of sound operating environments; and

  - inadequate identification of financial, reputational, and legal risks, and absence of internal communication about those risks among boards of directors and senior management.

- **Organizational structure and availability of staffing.** Examiners found inadequate organization and staffing of foreclosure units to address the increased volumes of foreclosures.

- **Affidavit and notarization practices.** Individuals who signed foreclosure affidavits often did not personally check the documents for accuracy or possess the level of knowledge of the information that they attested to in those affidavits. In addition, some foreclosure documents indicated they were executed under oath, when no oath was administered. Examiners also found that the majority of the servicers had improper notary practices which failed to conform to state legal requirements. These determinations were based primarily on servicers' self-assessments of their foreclosure processes and examiners' interviews of servicer staff involved in the preparation of foreclosure documents.

- **Documentation practices.** Examiners found some—but not widespread—errors between actual fees charged and what the servicers' internal records indicated, with servicers undercharging fees as frequently as overcharging them. The dollar amount

---

[4]  This report captures only the significant issues found across the servicers reviewed, not necessarily findings at each servicer.

[5]  Servicemembers Civil Relief Act, 50 USC App. sections. 501–596, Public Law 108-189.

of overcharged fees as compared with the servicers' internal records was generally small.

- **Third-party vendor management.** Examiners generally found adequate evidence of physical control and possession of original notes and mortgages. Examiners also found, with limited exceptions, that notes appeared to be properly endorsed and mortgages and deeds of trust appeared properly assigned.[6] The review did find that, in some cases, the third-party law firms hired by the servicers were nonetheless filing mortgage foreclosure complaints or lost-note affidavits even though proper documentation existed.

- **Quality control (QC) and audit.** Examiners found weaknesses in quality control and internal auditing procedures at all servicers included in the review.

## Summary of Supervisory Response

The agencies recognize that a number of supervisory actions and industry reforms are required to address these weaknesses in a way that will hold servicers accountable for establishing necessary governance and controls. Measures that the servicers are being required to implement are designed to ensure compliance with applicable laws, promote foreclosure processing in a safe and sound manner, and establish responsible business practices that provide accountability and appropriate treatment to borrowers.

---

[6]  The agencies expect federally regulated servicers to have the necessary policies and procedures in place to ensure that notes are properly endorsed and mortgages are properly assigned, so that ownership can be determined at the time of foreclosure. Where federally regulated servicers serve as document custodians for themselves or other investors, the agencies require controls and tracking systems to properly safeguard the physical security and maintenance of critical loan documents.

At this time, the agencies are taking formal enforcement action against each of the 14 servicers and parent bank holding companies because the deficiencies and weaknesses identified during the reviews represent unsafe or unsound practices and violations of applicable law. The foreclosure-file reviews showed that borrowers in the sampled pool were seriously delinquent. The reviews also showed that the appropriate party brought the foreclosure action. However, a limited number of mortgages should not have proceeded to foreclosure because of an intervening event or condition. Nevertheless, the weaknesses in servicers' foreclosure processes, as confirmed by the reviews, present significant risk to the safety and soundness of mortgage activities. The failures and deficiencies identified as part of the reviews must be remedied swiftly and comprehensively.

The agencies will continue to assess and monitor corrective actions and will address servicers' failures to correct identified deficiencies where necessary.

Going forward, servicers must develop and demonstrate effective risk management of servicing operations to prevent a recurrence of deficiencies cited in this report. The agencies are currently engaged in an effort to establish national mortgage-servicing standards to promote the safe and sound operation of mortgage-servicing and foreclosure processing, including standards for accountability and responsiveness to borrower concerns. Such an effort will include engaging the Government Sponsored Enterprises, private investors, consumer groups, the servicing industry, and other regulators. Part 4 of this report provides a general overview of the core principles that should be included in future national mortgage-servicing standards.

# Part 1: Background and Risks Associated with Weak Foreclosure Process and Controls

Mortgage servicing plays a central role in the management of mortgage loans from origination to final disposition. The mortgage servicer is the intermediary between borrowers and their lenders. When the borrower is paying as agreed, the servicer's duties are ministerial: collecting payments, distributing payments to investors, managing cash and administering funds in escrow, and reporting to investors. When a loan is in default, the demands on the servicer necessarily expand, requiring additional resources and much more sophisticated risk management. A necessary consequence of the growth in foreclosures since 2007 is increased demands on servicers' foreclosure processes.

The residential mortgage-servicing market is highly concentrated among a few servicers. The five largest mortgage servicers by activity volume—included among the 14 servicers subject to the reviews addressed in this report—account for 60 percent of the industry's total servicing volume.[7] The 14 servicers included in the interagency review collectively represent more than two-thirds of the servicing industry (see **figure 1**), or nearly 36.7 million mortgages.[8]

At the end of the fourth quarter of 2010, nearly 54 million first-lien mortgage loans were outstanding, 2.4 million of which were at some point in the foreclosure process. Additionally, two million mortgages were 90 or more days past due and at an elevated risk of foreclosure. New foreclosures are on pace to approach 2.5 million by the end of 2011. In light of the number of foreclosures and continued weakness in overall mortgage performance, the agencies are concerned that the deficiencies in foreclosure





Figure 1. Concentration of the mortgage-servicing industry

68%  32%

■ 14 examined servicers
▨ All other servicers

Source: Federal Reserve staff estimates of the concentration of servicing volume, based on data from Inside Mortgage Finance.

processing observed among these major servicers may have widespread consequences for the housing market and borrowers.

## Impact on Borrowers

Weaknesses in foreclosure processes and controls present the risk of foreclosing with inaccurate documentation, or foreclosing when another intervening circumstance should intercede. Even if a foreclosure action can be completed properly, deficiencies can result (and have resulted) in violations of state foreclosure laws designed to protect consumers. Such weaknesses may also result in inaccurate fees and charges assessed against the borrower or property, which may make it more difficult for borrowers to bring their loans current. In addition, borrowers can find their loss-mitigation options curtailed because of dual-track processes that result in foreclosures even when a borrower has been approved for a loan modification. The risks presented by weaknesses in foreclosure processes are more acute when those processes are aimed at speed and quantity instead of quality and accuracy.

---

[7] The five largest mortgage servicers in order are Bank of America, Wells Fargo, JPMorgan Chase, Citibank, and Ally Bank/GMAC.

[8] Federal Reserve staff estimates 54 million first-lien mortgages outstanding as of December 31, 2010.

## Impact on the Industry and Investors

Weaknesses in foreclosure processes pose a variety of risks to the financial services industry and investors. These risks extend beyond the financial cost of remedying procedural errors and re-filing affidavits and other foreclosure documents. Servicers may also bear legal costs related to disputes over note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations. Servicers may be subject to claims by investors as a result of delays or other damages caused by the weaknesses. Furthermore, concerns about the prevalence of irregularities in the documentation of ownership may cause uncertainty for investors of securitized mortgages. Servicers and their affiliates also face significant reputational risk with their borrowers, with the court system, and with regulators.

## Impact on the Judicial Process

Weaknesses in foreclosure processes have resulted in increased demands on judicial resources to resolve a variety of foreclosure-related matters, including note ownership. In addition, courts rely extensively on affidavits (usually affidavits of indebtedness) submitted by servicers to decide foreclosure actions on a summary basis without requiring in-person testimony.[9] If such affidavits were not properly prepared or executed, courts may lose confidence in the reliability of the affidavits as persuasive evidence filed on behalf of servicers.[10]

## Impact on the Mortgage Market and Communities

Weaknesses in foreclosure processes led several servicers to slow, halt, or suspend foreclosure proceedings in late 2010, and, in many cases, re-file foreclosure documents. Delays in foreclosure processing, which averaged 450 days in the fourth quarter of 2010, slow the clearing of excess inventory of foreclosed properties and lead to extended periods of depressed home prices.[11] Such delays also impede the efficient disposition of foreclosed homes and the clearing of seriously delinquent mortgages, particularly in geographic regions with greater concentrations of vacant and abandoned properties. This outcome acts as an impediment for communities working to stabilize local neighborhoods and housing markets.[12]

Moreover, local property values may be adversely affected if foreclosed homes remain vacant for extended periods, particularly if such homes are not properly maintained.[13] Widely publicized weaknesses in foreclosure processes also adversely affect home buyer and investor confidence. Assuring robust and credible remedial programs for mortgage servicers so that foreclosure processes can operate and markets can clear without impediments or interventions contributes to attaining a stable national housing market.

---

[9]  The basic affidavit of indebtedness typically sets forth the name of the party that owns the loan, the default status, and the amounts due for principal, interest, penalties (such as late charges), and fees. This affidavit is frequently the principal basis upon which a court is permitted to order a foreclosure without requiring in-person testimony. Similar documentation may be required in bankruptcy proceedings.

[10]  Mortgage foreclosures occur under either a judicial or a nonjudicial process. Judicial foreclosures are court-supervised and require the lender to bring a court action to foreclose. Nonjudicial foreclosures (also known as "power of sale") involve little or

no court oversight and generally are governed by state statutes. Even foreclosures that are instituted outside the judicial process can be challenged in court, however, and then become subject to court actions.

[11]  See *Lender Processing Services Applied Analytics* (December 2010, www.lpsvcs.com/RiskMgmt). Current time frames to move a property to foreclosure sale have increased from an average of 250 days in first quarter 2008 to 450 days by fourth quarter 2010.

[12]  Industry data show approximately four million properties currently listed that have been foreclosed in the past few years. See Mortgage Bankers Association, *National Delinquency Survey*, (November 18, 2010, www.mbaa.org/NewsandMedia/PressCenter/74733.htm).

[13]  Campbell, John Y., Stefano Giglio and Parag Pathak (July 2010) *Forced Sales and House Prices.Manuscript*, Harvard University Department of Economics (kuznets.fas.harvard.edu/~campbell/papers/forcedsales072410.pdf).

# Part 2: Review Findings

The reviews found critical weaknesses in foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party law firms and other vendors. These weaknesses involve unsafe and unsound practices and violations of applicable federal and state laws and requirements, and they have had an adverse effect on the functioning of the mortgage markets. By emphasizing speed and cost efficiency over quality and accuracy, examined servicers fostered an operational environment contrary to safe and sound banking practices.

In connection with the reviews of sampled files and assessments of servicers' custodial activities, examiners found that borrowers whose files were reviewed were seriously delinquent on their mortgage payments at the time of foreclosure and that servicers generally had sufficient documentation available to demonstrate authority to foreclose on those borrowers' mortgages.[14] Nevertheless, examiners noted instances where documentation in the foreclosure file alone may not have been sufficient to prove ownership of the note at the time the foreclosure action commenced without reference to additional information. When additional information was requested and provided to examiners, it generally was sufficient to determine ownership.

In addition, review of the foreclosure files showed that servicers were in contact with the delinquent borrowers and had considered loss-mitigation alternatives, including loan modifications. Examiners also noted a small number of foreclosure sales, however, that should not have proceeded because of an inter-

vening event or condition, such as the borrower: (a) was covered by the Servicemembers Civil Relief Act, (b) filed bankruptcy shortly before the foreclosure action, or (c) was approved for a trial modification.

A summary of the major findings identified during the reviews is set forth below.

## Foreclosure Process Governance

Examiners found governance at each examined servicer in need of substantial improvement, and often cited the absence of sound controls and ineffective management of foreclosure processes. Foreclosure policies and procedures at many of the servicers were either weak or needed substantial expansion to provide effective guidance, control, and ongoing monitoring. As noted above, examiners concluded that the majority of servicers reviewed had inadequate affidavit and notary-signing processes that did not ensure proper attestation (or verification) of the underlying documents.

Examiners found that most servicers had inadequate staffing levels and training programs throughout the foreclosure-processing function and that a large percentage of the staff lacked sufficient training in their positions. The reviews also revealed that all of the servicers relied heavily on outsourcing arrangements with outside counsel and other third-party vendors to carry out foreclosure processes without adequate oversight of those arrangements. Some servicers failed to enter into contracts with the foreclosure law firms performing critical steps in the foreclosure process, including affidavit- and notary-preparation signing processes. Audit and quality-assurance controls and self-assessment reviews at all of the examined servicers lacked comprehensiveness and failed to identify specific weaknesses and process gaps. Details on these areas of weakness are included below.

---

[14] As previously noted, examiners were limited to the documents in the foreclosure files. Those documents may not have disclosed certain facts that might have led examiners to conclude that a foreclosure should not have proceeded, such as misapplication of payments that could have precipitated a foreclosure action or oral communications between the borrower and servicer staff that were not documented in the foreclosure file.

## Organizational Structure and Availability of Staffing

At the time of the review, a majority of the servicers had inadequate staffing levels or had recently added staff with limited servicing experience. In most instances, servicers maintained insufficient staff to appropriately review documents for accuracy, and provided inadequate training for affidavit signers, notaries, and quality-control staff. Examiners also noted weak controls, undue emphasis on quantitative production and timelines, and inadequate workload monitoring.

## Affidavit and Notarization Practices

Deficiencies in servicers' processes, procedures, controls, and staffing resulted in numerous inaccurate affidavits and other foreclosure-related documents. Examiners found that most servicers had affidavit signing protocols that expedited the processes for signing foreclosure affidavits without ensuring that the individuals who signed the affidavits personally conducted the review or possessed the level of knowledge of the information that they attested to in those affidavits. Examiners confirmed these deficiencies through interviews with individuals who signed documents, as well as through a review of servicers' self-assessments. Examiners also found the majority of the servicers had improper notary practices that failed to conform to state legal requirements. Examiners noted some servicers failed to maintain an accurate list of approved and acceptable notaries that individuals signing documents did not do so in the presence of a notary when required, and that documents often were executed in a manner contrary to the notary's acknowledgement and verification of those documents. In addition, some foreclosure documents indicated they were executed under oath when no oath was administered. Again, examiners confirmed these deficiencies by interviewing notaries and reviewing servicers' self-assessments.

At the examined servicers, anywhere from 100 to more than 25,000 foreclosure actions occurred per month between January 1, 2009, and December 31, 2010, with the quantity depending upon the size of the servicer's operations. It was common to find an insufficient number of staff assigned to review, sign, and notarize affidavits. At some of the servicers, examiners found that insufficient staff—or the lack of specified guidance to staff or external law firms on

affidavit completion—contributed to the preparation and filing of inaccurate affidavits. In the sample of foreclosure files reviewed, examiners compared the accuracy of the amounts listed on affidavits of indebtedness to the documentation in the paper foreclosure file or computerized loan servicing systems. Although borrowers whose foreclosure files were reviewed were seriously in default at the time of the foreclosure action, some servicers failed to accurately complete or validate itemized amounts owed by those borrowers. At those servicers, this failure resulted in differences between the figures in the affidavit and the information in the servicing system or paper file. In nearly half of those instances, the differences—which were typically less than $500—were adverse to the borrower. While the error rates varied among the servicers, the percentage of errors at some servicers raises significant concerns regarding those servicers' internal controls governing foreclosure-related documentation.

## Documentation Practices

During the foreclosure-file reviews, examiners compared the accuracy of amounts listed on the servicers' affidavits of indebtedness with documentation on file or maintained within the electronic servicing system of record. For most of the servicers, examiners cited the lack of a clear auditable trail in reconciling foreclosure filings to source systems of record. In some cases, examiners directed servicers to further audit foreclosure filings to verify the accuracy of information and compliance with legal requirements. Likewise, in connection with the file review, examiners also determined whether critical foreclosure documents were in the foreclosure files, and whether notes appeared properly endorsed and mortgages appeared properly assigned. Examiners noted instances where documentation in the foreclosure file alone may not have been sufficient to prove authority to foreclose without reference to additional information.[15] When more information was requested and provided, it generally was sufficient to determine authority. With some exceptions, examiners found that notes appeared properly endorsed, and mortgages appeared properly assigned.[16] Examiners also trav-

---

[15] Servicers frequently maintained custody of original mortgage documents, although in some cases third-party trustees or custodians held original documents. Custodians are entrusted to manage the original documents that establish note ownership, and, when necessary, produce the original documents for a foreclosure action.

[16] Only in rare instances were custodians unable to produce origi-

eled to servicers' document repository locations to assess custodial activities. Examiners found that servicers generally had possession and control over critical loan documents such as the promissory notes and mortgages. The review did find that, in some cases prior to 2010, the third-party law firms hired by the servicers were nonetheless filing lost-note affidavits or mortgage foreclosure complaints in which they claimed that the mortgage note had either been lost or destroyed, even though proper documentation existed.

## Third-party Vendor Management

The agencies found that the servicers reviewed generally did not properly structure, carefully conduct, or prudently manage their third-party vendor relationships with outside law firms and other third-party foreclosure services providers. Failure to effectively manage third-party vendors resulted in increased reputational, legal, and financial risks to the servicers.

### Arrangements with Outside Law Firms

Servicers typically used third-party law firms to prepare affidavits and other legal documents, to file complaints and other pleadings with courts, and to litigate on their behalf in connection with foreclosure and foreclosure-related bankruptcy proceedings. The servicers reviewed generally showed insufficient guidance, policies, or procedures governing the initial selection, management, or termination of the law firms that handled their foreclosures. Many servicers, rather than conducting their own due diligence, relied on the fact that certain firms had been designated as approved or accepted by investors. Servicers often did not govern their relationships with these law firms by formal contracts. Instead, servicers frequently relied on informal engagements with law firms, at times relying on investors' business relationships with the law firms or the law firms' contractual relationships with default management service providers.

#### Inadequate Oversight

Servicers also did not provide adequate oversight of third-party vendor law firms, including monitoring for compliance with the servicers' standards. Several

servicers exempted third-party law firms from the servicers' vendor management programs or did not identify them as third-party vendors subject to those programs. In some cases, servicers assumed that investors performed such oversight, in which case oversight was limited to ensuring that the law firms were on the investors' lists of approved or accepted providers. Where monitoring of law firms was conducted, it was often limited to things such as responsiveness and timeliness, checking for liability insurance, or determining if any power of attorney given to the firm remained valid rather than assessing the accuracy and adequacy of legal documents or compliance with state law or designated fee schedules.

#### Document Retention Weaknesses

Examiners also found that the servicers did not always retain originals or copies of the documents maintained by the third-party law firms that conducted their foreclosures. Instead, the servicers relied on the firms to maintain those documents. The absence of central and well-organized foreclosure files by the servicers and the consequent need for the examiners to collect foreclosure documentation derived from numerous sources made it difficult at times for examiners to conduct full foreclosure-file reviews while on-site.

#### Inadequate guidance, policies, procedures, and contracts

In addition, examiners generally found an absence of formal guidance, policies, or procedures governing the selection, ongoing management, and termination of law firms used to handle foreclosures. This deficiency resulted in a lack of clarity regarding roles, responsibilities, and performance parameters. Examiners also observed an absence of written contracts between certain servicers and law firms, which left those servicers with no contractual recourse for liability against the firms for performance issues. These deficiencies, coupled with the overall lack of adequate oversight, contributed to instances in which servicers and law firms failed to identify problems with the firms' foreclosure practices, thereby exposing the servicers to a variety of significant risks.

Those problems include instances in which law firms signed documents on behalf of servicers without having the authority to do so, or they changed the format and content of affidavits without the knowledge of the servicers. These defects could, depending upon the circumstances, raise concerns regarding the legality and propriety of the foreclosure even if the ser-

---

nal loan documentation, and in those instances the servicers generally were able to provide adequate explanations, including that copies in the possession of the custodian were acceptable under applicable law.

vicer had sufficient documentation available to dem-
onstrate authority to foreclose.

## Arrangements with Default Management Service Providers (DMSPs)

In connection with the on-site reviews of servicers,
the agencies also conducted an on-site review of
Lender Processing Services, Inc. (LPS), which pro-
vides significant services to support mortgage-
servicing and foreclosure processing across the indus-
try. The review of LPS involved a number of issues
that are similar to those raised in the reviews of the
servicers, and the LPS review covered issues that are
unique to the operations, structure and corporate
governance of LPS. During the review of LPS, the
agencies found deficient practices related primarily to
the document execution services that LPS, through
its DocX, LLC, and LPS Default Solutions, Inc. sub-
sidiaries had provided to servicers in connection with
foreclosures. To address these issues, the agencies are
taking formal enforcement action against LPS under
section 7(d) of the Bank Service Company Act, 12
USC § 1867(d), and section 8(b) of the Federal
Deposit Insurance Act, 12 USC § 1818(b).

### Inadequate Contracts

During the review of servicers, examiners assessed
servicers' relationships with third-party vendor
DMSPs, focusing primarily on DMSPs that sup-
ported the execution of foreclosure-related docu-
ments, such as affidavits of indebtedness, lost-note
affidavits, and assignments of mortgages.[17] Examin-
ers found that contracts between the servicers and
DMSPs generally were inadequate, often omitting
significant matters such as service-level agreements.
Contracts did not provide for an appropriate level of
oversight of third-party vendor law firms in situa-
tions where the servicers relied on the DMSPs to
conduct such oversight.

### Inadequate Oversight

Examiners also observed that servicers generally
demonstrated an overall lack of adequate oversight
of DMSPs. At times, the servicers failed to identify
DMSPs as vendors subject to the servicers' vendor
management programs and demonstrated an inabil-
ity to provide the examiners with sufficient evidence
of due diligence. Examiners found no evidence that
servicers conducted audits of the document execu-
tion operations of their DMSPs.

---

[17] Not all of the servicers engaged the services of third-party
vendor DMSPs to perform document execution services.

The lack of sufficient oversight of DMSPs, coupled
with the contractual deficiencies, led to instances in
which employees of those DMSPs signed foreclosure
affidavits without personally conducting the review
or possessing the level of knowledge of information
that they attested to in those affidavits. Employees of
DMSPs, like the employees of the servicers them-
selves, executed documents in a manner contrary to
the notary's acknowledgement and verification of
those documents. In addition, in limited instances,
employees of DMSPs signed foreclosure-related
documents on behalf of servicers without proper
authority. Because some of the servicers relied on
DMSPs to oversee their third-party vendor law
firms, the contractual deficiencies and lack of over-
sight of DMSPs contributed to the weaknesses iden-
tified above regarding the oversight of third-party
vendor law firms.

## Arrangements with Mortgage Electronic Registration Systems, Inc.

In connection with the on-site reviews of servicers,
the agencies, together with the Federal Housing
Finance Agency (FHFA), also conducted an on-site
review of MERSCORP and its wholly owned subsid-
iary, Mortgage Electronic Registration Systems, Inc.
(collectively, MERS), which, as detailed below, pro-
vides significant services to support mortgage-
servicing and foreclosure processing across the indus-
try. The review of MERS involved a number of
issues that are similar to those raised in the reviews of
the servicers, and the MERS review covered issues
that are unique to the operations, structure and cor-
porate governance of MERS. During the review of
MERS, the agencies and FHFA found significant
weaknesses in, among other things, oversight, man-
agement supervision and corporate governance. To
address these issues, the agencies, together with
FHFA, are taking formal enforcement action against
MERS under section 7(d) of the Bank Service Com-
pany Act, 12 USC § 1867(d), and section 8(b) of the
Federal Deposit Insurance Act, 12 USC § 1818(b).

MERS streamlines the mortgage recording and
assignment process in two ways. First, it operates a
centralized computer database or registry of mort-
gages that tracks the servicing rights and the benefi-
cial ownership of the mortgage note. Each mortgage
registered in the database is assigned a Mortgage
Identification Number (MIN). Second, MERS can
be designated by a member (and its subsequent
assignees) to serve in a nominee capacity as the mort-
gagee of record in public land records. Designating

MERS as the mortgagee is intended to eliminate the need to prepare and record successive assignments of mortgages each time ownership of a mortgage is transferred. Rather, changes in beneficial ownership of the mortgage note (and servicing rights) are tracked in the MERS registry using the MIN.[18] All of the examined servicers had relationships with MERS.

### Inadequate Oversight

Servicers exercised varying levels of oversight of the MERS relationship, but none to a sufficient degree. Several of the servicers did not include MERS in their vendor management programs. In these instances, the servicers failed to conduct appropriate due diligence assessments and failed to monitor, evaluate, and appropriately manage the MERS contractual relationship. Deficiencies included failure to assess the internal control processes at MERS, failure to ensure the accuracy of servicing transfers, and failure to ensure that servicers' records matched MERS' records.

### Inadequate Quality Control

Examiners also determined that servicers' quality-control processes pertaining to MERS were insufficient. In some cases, servicers lacked any quality-assurance processes and relied instead on the infrequent and limited audits that MERS periodically conducted. Other deficiencies included the failure to conduct audit reviews to independently verify the adequacy of and adherence to quality-assurance processes by MERS, and the need for more frequent and complete reconciliation between the servicers' systems and the MERS registry. Several servicers did not include MERS activities in the scope of their audit coverage.

## Ineffective Quality Control (QC) and Audit

Examiners found weaknesses in quality-control procedures at all servicers, which resulted in servicers not

performing one or more of the following functions at a satisfactory level:

- ensuring accurate foreclosure documentation, including documentation pertaining to the fees assessed;

- incorporating mortgage-servicing activities into the servicers' loan-level monitoring, testing, and validation programs;

- evaluating and testing compliance with applicable laws and regulations, court orders, pooling and servicing agreements, and similar contractual arrangements; and

- ensuring proper controls to prevent foreclosures when intervening events or conditions occur that warrant stopping the foreclosure process (e.g., bankruptcy proceedings, applicability of the Servicemembers Civil Relief Act, or adherence to a trial or permanent loan modification program).

Examiners also found weaknesses in internal auditing procedures at all the servicers included in the review. When performed, the few internal audits conducted by servicers failed to identify fundamental control issues that led to the foreclosure process breakdowns. Failures to perform internal audits effectively resulted in servicers' inability to identify, address, and internally communicate foreclosure-processing risks. The failures to identify and communicate these risks resulted in servicers not strengthening the quality of risk-management processes to a level consistent with the nature, increasing size, and complexity of the servicer's foreclosure activities. Moreover, failure to conduct comprehensive audits to identify weaknesses in foreclosure processes resulted in servicers not taking sufficient corrective action to strengthen policy and procedural gaps, increase staffing levels, and improve training in response to sharply rising foreclosure volumes prior to the agencies' foreclosure reviews. The failure to identify the risks associated with foreclosure processing also resulted in servicers not taking action to improve foreclosure documentation-related processes ranging from custody and control of documents to proper notarization processes, or to enhance oversight of third parties managing foreclosure activities on their behalf.

---

[18] While MERS maintains a registry of the beneficial ownership of the mortgage note, this registry is not a system of legal record. The ownership of the note is determined by the Uniform Commercial Code, and, if a change in ownership of a note is not recorded in MERS or is recorded incorrectly, the transfer is still valid.

This page left intentionally blank.

# Part 3: Supervisory Response

At this time, the agencies are taking formal enforcement actions against each of the 14 servicers under the authority of section 8(b) of the Federal Deposit Insurance Act, 12 USC § 1818(b). The deficiencies and weaknesses identified by examiners during their reviews involved unsafe or unsound practices and violations of law, which have had an adverse impact on the functioning of the mortgage markets. Furthermore, the mortgage servicers' deficient foreclosure processes confirmed during the reviews have compromised the public trust and confidence in mortgage servicing and have consequences for the housing market and borrowers. The formal enforcement actions will require servicers, among other things, to:

- **Compliance program:** Establish a compliance program to ensure mortgage-servicing and foreclosure operations, including loss mitigation and loan modification, comply with all applicable legal requirements and supervisory guidance, and assure appropriate policies and procedures, staffing, training, oversight, and quality control of those processes.

- **Foreclosure review:** Retain an independent firm to conduct a review of residential foreclosure actions that were pending at any time from January 1, 2009, through December 31, 2010, to determine any financial injury to borrowers caused by errors, misrepresentations, or other deficiencies identified in the review, and to remediate, as appropriate, those deficiencies.

- **Dedicated resources for communicating with borrowers/single point of contact:** Ensure the following: effective coordination of communication with borrowers related to foreclosure, loss mitigation, and loan modification activities; assurance that communications are timely and appropriate and designed to avoid borrower confusion; continuity in the handling of borrower cases during the loan modification and foreclosure processes; reasonable and good faith efforts, consistent with applicable law and contracts, to engage in loss mitigation and foreclosure prevention for delin-

quent loans where appropriate; and assurances that decisions concerning loss mitigation or loan modifications will be made and communicated in a timely manner.

- **Third-party management:** Establish policies and procedures for outsourcing foreclosure or related functions to ensure appropriate oversight and that activities comply with all applicable legal requirements, supervisory guidance, and the servicer's policies and procedures, including the appropriate selection and oversight of all third-party service providers, including external legal counsel, DMSPs, and MERS.

- **Management information systems:** Improve management information systems for foreclosure, loss mitigation, and loan modification activities that ensure timely delivery of complete and accurate information to facilitate effective decision making.

- **Risk assessment:** Retain an independent firm to conduct a written, comprehensive assessment of risks in servicing operations, particularly in the areas of foreclosure, loss mitigation, and the administration and disposition of other real estate owned, including but not limited to operational, compliance, transaction, legal, and reputational risks.

In addition to the actions against the servicers, the Federal Reserve and the OTS have issued formal enforcement actions against the parent holding companies to require that they enhance on a consolidated basis their oversight of mortgage-servicing activities, including compliance, risk management, and audit.

The agencies will monitor and assess, on an ongoing basis, the corrective actions taken by the servicers and holding companies that are required by the enforcement actions and take further action, when necessary, to address failures. Enforcement actions and more frequent monitoring will remain in place at each servicer until that servicer has demonstrated that its weaknesses and deficiencies have been cor-

rected, including that adequate policies, procedures, and controls are in place. The agencies will continue to explore ways to improve their supervisory frameworks to identify more promptly and effectively the potential risks in mortgage-servicing and other banking operations.

# Part 4: Industry Reforms

Financial regulatory agencies are developing standards within their authority to improve the transparency, oversight, and regulation of mortgage-servicing and foreclosure processing and to set additional thresholds for responsible management and operation of mortgage-servicing activities. Moreover, a uniform set of national mortgage-servicing and foreclosure-processing standards would help promote accountability and appropriateness in dealing with consumers and strengthen the housing finance market.

Industry reforms that could improve the oversight and regulation of mortgage-servicing and foreclosure processing should generally include standards that require servicers to address major areas of weaknesses highlighted in the review, including in the following general areas:

## Governance and Oversight

- implement and routinely audit sound enterprise-wide policies and procedures to govern and control mortgage-servicing and foreclosure processes

- develop quality controls for effective management of third-party vendors who support mortgage-servicing and foreclosure processing

- strengthen the governance standards intended to ensure compliance with applicable federal and state laws and company policies and procedures

- develop company standards that emphasize accuracy and quality in the processing and validation

of foreclosure and other servicing-related documents throughout the entire foreclosure process

## Organizational Structure, Staffing, and Technology

- increase staffing to adequate levels and provide them with requisite training to effectively manage the volume of default loans and foreclosures

- upgrade information systems and practices to better store, track, and retrieve mortgage-related documents

## Accountability and Responsiveness Dealing with Consumers

- ensure borrowers are offered appropriate loss-mitigation options

- ensure proper custody and control of borrower documents related to the servicing of the mortgage

- increase coordination between loss mitigation and foreclosure-processing units to prevent inappropriate foreclosures

- improve communication with borrowers and establish measurable goals and incentives for delivering accurate information and responsive assistance

- develop complaint-resolution processes that are routinely monitored and measured for quality assurance

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Philip S. Gutierrez and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

## CV12- 11034 PSG (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Warren M. Chadwick Jr., In Pro-Per
11308 Blue Sage Drive
Sylmar, CA 91342
(818) 414-6853

FOR OFFICE USE ONLY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARREN M. CHADWICK JR.<br><br>PLAINTIFF(S)<br><br>v.<br><br>BANK OF AMERICA N.A.,<br><br>"See Attached"<br><br>DEFENDANT(S). | **CASE NUMBER**<br>CV12-11034- PSG(JCGx)<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S):    **FOR OFFICE USE ONLY**

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, __Warren M. Chadwick Jr._____, whose address is __11308 Blue Sage Drive, Sylmar, CA 91342_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: DEC 2 8 2012

By: _____ANDRES PEDRO_____
Deputy Clerk

(Seal of the Court)
1202

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

FOR OFFICE USE ONLY

Attachment to Summons

BAC HOME LOANS SERVICING, LP; THE BANK OF NEW YORK MELLON f/k/a THE
BANK OF NEW YORK, as Trustee for the Certificate Holders of CWABS, Inc., Asset-Backed
Certificates, Series 2007-13; RECONTRUST COMPANY N.A.
and DOES 1 THROUGH 10 INCLUSIVE,

　　　　Defendants

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☒) WARREN M. CHADWICK JR. | DEFENDANTS BANK OF AMERICA N.A., et al "See Attached" |
|---|---|

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) WARREN M. CHADWICK JR.   In Pro Per 11308 BLUE SAGE DRIVE   (818) 414-6853 SYLMAR, CA 91342 | Attorneys (If Known) |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C §1692-1692p, et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty ☐ 540 Mandamus/ Other | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 790 Other Labor Litigation |
| ☒ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment ☐ 240 Torts to Land | | | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability ☐ 290 All Other Real Property | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) ☐ 871 IRS-Third Party 26 USC 7609 |

## CV12-11034

**FOR OFFICE USE ONLY:**   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County , California | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | State of Delaware |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County , California | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): ~~signature~~       Date 12/26/2012

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

1

<u>Attachment to Civil Cover Sheet</u>

2

3

BAC HOME LOANS SERVICING, LP; THE BANK OF NEW YORK MELLON f/k/a THE

4

BANK OF NEW YORK, as Trustee for the Certificate Holders of CWABS, Inc., Asset-Backed

5

Certificates, Series 2007-13; RECONTRUST COMPANY N.A.

and DOES 1 THROUGH 10 INCLUSIVE,

6

7

    Defendants,

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attachment to Civil Cover Sheet - 1